**Johnny C. WILSON et al., Plaintiffs,**

**v.**

**Asa D. KELLEY, Jr., Director of the State Board of Corrections of Georgia, et al., Defendants.**

**Civ. A. No. 11647.**

United States District Court
N. D. Georgia,
Atlanta Division.

June 27, 1968.

---

John Wm. Brent, Decatur, Ga., Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., P. Walter Jones, Albany, Ga., Charles Morgan, Jr., Reber F. Boult, Jr., Atlanta, Ga., Arthur Kinoy, Melvin L. Wulf, New York City, C. B. King, Albany, Ga., for plaintiffs.

Twitty & Twitty, Frank S. Twitty, Sr., Camilla, Ga., for defendant, Lynwood Williford.

Arthur K. Bolton, Atty. Gen., Harold N. Hill, Jr., W. Wheeler Bryan, Asst. Attys. Gen., State of Georgia, Atlanta, Ga., for defendant, Wm. H. Burson.

Arthur K. Bolton, Atty. Gen., Marion O. Gordon, Mathew Robins, Asst. Attys. Gen., John W. Hinchey, Atlanta, Ga., for defendant, Asa D. Kelley, Jr.

Farkas, Landau & Davis, Albany, Ga., for defendant, Lewis Davis.

Harold Sheats, County Atty., John T. Ferguson, Asst. County Atty., Atlanta, Ga., for T. Ralph Grimes.

Arthur K. Bolton, Atty. Gen., Alfred L. Evans, Jr., Asst. Atty. Gen., Don L. Hartman, Atlanta, Ga., for defendants, Edwin L. Swain, Thomas H. Milner, Jr., L. E. Bowen, Sr., and Dr. Hugh A. Goodwin.

Marion O. Gordon, Asst. Atty. Gen., for John B. Stanley, Stetson Bennett, Jr., Richard W. Watkins, Jr., and Jack T. Rutledge.

Before TUTTLE, Circuit Judge, and HOOPER and SMITH, District Judges.

SIDNEY O. SMITH, Jr., District Judge:

In this three-judge suit, the plaintiffs bring this action for declaratory and injunctive relief. Plaintiffs are white and black inmates, former inmates, or prospective inmates of all Georgia penal institutions at the juvenile, municipal, county and state levels. The defendants

are the officials responsible for the operation of such institutions and, as finally constituted, include the Georgia State Board for Children and Youth and its Director (juveniles), a city jailor (municipal), two county sheriffs and a county Public Works Camp warden (county), the State Board of Corrections and its Director (state), and the state Personnel Board and its Director of the State Merit System.

The suit presents, and the case was tried, on three basic complaints seeking:

I. To abolish segregation in all jails and penal institutions of the state of Georgia.

II. To prevent alleged discrimination in the employment of Negroes at penal institutions and as deputy sheriffs within the state of Georgia, and

III. To abolish all county Public Works Camps within the state of Georgia.

### I.

The Georgia penal system is not a single entity, but is made up of several parts with different officials responsible for the administration of each type unit. Juvenile offenders (under 17 years of age) are, after commitment by juvenile courts, confined in area detention centers or state training schools operated by the State Board for Children and Youth as a Division of the Department of Family and Children Services, the state welfare agency. City jails are maintained by most Georgia unincorporated municipalities and house offenders of local ordinances and, initially, offenders of state laws arrested by municipal policemen prior to transfer for state trial. Each of Georgia's 159 counties

also maintains through its Sheriff and deputies, a jail for housing persons accused of state violations prior to trial and for the service of minimal jail-type sentences. Prior to 1964 on an optional basis,[1] the County Commissioners of several counties established Public Works Camps which are subject to the supervision and control of the State Board of Corrections. Upon approval, such camps are authorized to receive prisoners for service of a State sentence and to employ them on certain authorized public works within the county. The public works camps wardens and guards are appointed by the County Commissioners, subject to approval of the State Board. Since 1964, each county, rather than the state, is required to house and maintain a large class of misdemeanants convicted of state offenses.[2] Thus some 72 county Public Works Camps now house state prisoners who are the responsibility of that county or neighboring counties who are too small or too poor to maintain such a facility as well as state prisoners assigned thereto by the Board of Corrections.

All felons and all other state prisoners are the responsibility of the Board of Corrections and are confined in penitentiary-type institutions, in state honor camps (primarily for first offenders) and the Alto Training Center (primarily for youthful offenders between 17 and 21 years of age). All tolled there are in excess of 10,000 persons under confinement in all institutions at any given time in Georgia.

With certain exceptions at the juvenile level, all prisoners are segregated by race in compliance with long-standing state policy enunciated in the statutes under attack in this case.[3] While such

---

1. See Ga. Code §. 77–312.

2. Basically such prisoners are those receiving sentences of six months or less or who serve any sentence up to twelve months for failure to pay an alternative fine. See Ga. Code § 27–2506; § 77–312 (d).

3. Ga. Code § 77–310(a) provides: The Board of Corrections shall provide for

the classification and segregation of prisoners with respect to race, age, first offenders, habitual criminals and incorrigibles, diseased inmates, mentally diseased inmates, and those having contagious, infectious and incurable diseases. Incorrigible prisoners in county public works camps shall be returned to the State Board of Corrections at the request of the proper county authority.

laws apply primarily to the state system, the other institutions through custom and practice have, as a matter of fact, housed their inmates by race.

Under such facts the law is clear, and this aspect of the case is controlled by the recent case of Frank Lee, Commissioner of Corrections of Alabama v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (March 11, 1968) (36 LW 4225) and in particular by the lower court opinion of Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966) which was termed "unexceptionable" by the Supreme Court in its affirmance.

■ Here, there are various motions by the defendants on the grounds that this is not a properly constituted class action under Rule 23. Any such doubts either as to the plaintiffs constituting a class or the propriety of the defendants' standing as representative of a class as to this aspect of the cases are dispelled by the discussion in the district court opinion. 263 F.Supp. 327 at 329–331 (I and II). It would serve no purpose to repeat such reasoning and authorities here. Accordingly, as to segregated jail facilities, we hold that this is a properly constituted class action on both sides.

■■ On the merits, the defendants candidly admit the effect of the Ala-bama case, and the statutes attacked insofar as they relate to physical and record segregation by race must fall as violative of the Fourteenth Amendment. It is reasonable to assume that the integration of such facilities will require careful planning and perhaps construction changes in existing institutions. The complete integration of all city and county jails, all county Public Works Camps, all state correctional institutions, and all juvenile facilities [4] shall therefore be accomplished on or before January 1, 1969. In this connection it is noted that studies are already underway in anticipation of this ruling. The six months allowed to comply appears reasonable to the court. However, if any bona fide plan or program necessitates a minimal additional time to complete, application may be made to this district court in writing not later than December 1, 1968, for a variance. In this regard, the exceptional right of prison authorities "acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails" is deemed to exist normally only after-the-fact and not before.[5] Otherwise, any segregated custody subsequent to January 1, 1969,

---

Ga.Code § 77–108 provides: The sheriff shall keep, in a well-bound book provided for that purpose, a record of all prisoners committed to the jail of the county of which he is sheriff, which record shall contain the name of the person committed, age, sex, and color, under what process committed, and from what court issued, the crime charged, the date of commitment to jail, and the day of discharge, and under what order discharged, and the court from which it issued; which book shall, at all times, be subject to examination by any person, and the sheriff shall keep the book on file in his office.

Ga.Code § 77–9904 provides: No person controlling convicts shall confine white and colored convicts together, or work them chained together, or chain them together going to or from their work, or at any other time. Any person and each member of a firm violating the provisions of this section shall be guilty of a misdemeanor.

4. Defendant Burson insists that his motion to dismiss as to juvenile detention should be sustained because the statutes involved are not applicable to that operation. However, the Fourteenth Amendment's prohibition of racial discrimination exists over and beyond any state statute and while there is a paucity of evidence that any such discrimination exists in the juvenile centers, it is admitted that certain State Training Schools are still being operated on a segregated basis pending completion of additional construction.

5. The "tank" situation alluded to by Judge Johnson in the district court opinion and the obvious impropriety of housing combatants in an assault or riot together constitute exceptions "before-the-fact." Otherwise, the danger to security, discipline, and good order must presently exist and be apparent to justify any segregation. This prohibits any standard policy or program of segregated custody at state, county, or local level.

shall be deemed to violate the dictates of *Washington* and the ruling of this court.

## II.

The largest single employer in correctional work in Georgia is, of course, the State Board of Corrections. Presently, of some 857 employees only 13 are Negroes. Vacancies are filled by the Board of Corrections under the state merit system which operates under the "rule of threes" common to the federal and most state systems, wherein the hiring authority is free to choose from three certified applicants. As seen, employees of the county Public Works Camps are named by the county governing authorities, mainly on an appointive basis and a few on a merit basis. The record is inexact as to such employees but it is apparent that most do not have Negro employees. The Sheriffs of each county are elected by popular vote and, with rare exception, name their own deputies. A growing number of Sheriffs throughout the state now employ Negro deputies, but many do not. City jails are maintained by city employees usually attached to the police department. The state-wide figures as to such employees are unknown. The single municipal defendant here (Davis) has no Negro employees.

In such a situation, the plaintiffs contend that Negroes who constitute 56% of prisoners in the state system, have a right to demand the hiring of Negro wardens, guards, and other employees at all levels.

■ However, not a single plaintiff or witness offered has ever even applied for a job in any such capacity. As prisoners they constitute a proper class for contesting their segregated status. However, as a proper class under Rule 23 for employment purposes they obviously do not. Likewise, as to the relief sought here, it is not shown that the named defendants are representative of the proposed class. "There are two general requirements for the maintenance of a class suit. The persons constituting the class must be so numerous that

it is impracticable to bring them all before the court, and the named representatives must be such as will fairly insure the adequate representation of all." Wright, Federal Courts, § 72.

■ The rule itself allows a class action when (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Federal Rules of Civil Procedure 23(a).

Further, the 159 Sheriffs allegedly represented by defendants Stinchcombe and Williford and the 72 wardens allegedly represented by defendant Stanley and the *countless municipalities* allegedly represented by defendant Davis are all separate employers. The hiring practices of each vary and have no connection with each other, and they are responsible to different superiors. A suit against one could no more bind them all than an employment claim against one automobile dealer, one bakery, or one business of any type could bind all the other like businesses within the state.

■ "Without a class on the one hand or a proper representative on the other, a class action pursuant to Rule 23(a) must fail. It is elementary that 'an individual suing in behalf of the members of the class must be a member of the class he is supposed to represent.' 2 Barron & Holtzoff, Federal Practice and Procedure § 567 at 308. See 3 Moore, Federal Practice 23.04." Hamer v. Campbell, 358 F.2d 215(1) (5th Cir. 1966). While great latitude has been allowed in class actions involving civil rights, it is fundamental that some plaintiff must show injury and the proposed class can rise no higher than the individual plaintiffs themselves. Thus, the plaintiffs cannot represent a class of whom they are not a part. Nor could the defendants represent a class of

whom they are not a part. McCabe v. Atchison, T. & S. F. R. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169(6) (1914); Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512(1); Brown v. Board of Trustees, 187 F.2d 20 (5th Cir. 1951); Rock Drilling, etc. v. Mason & Hanger Co., 217 F.2d 687(5) (2d Cir. 1954); Reddix v. Lucky, 252 F.2d 930(6) (5th Cir. 1958); Slack v. Stiner, 358 F.2d 65(5) (5th Cir. 1966); Pacific Inter-Club Yacht Assn. v. Morris, 197 F.Supp. 218(15) (N.D.Cal. 1960); Clark v. Thompson, 206 F.Supp. 539 (S.D.Miss.1962) aff'd 313 F.2d 637 (5th Cir. 1963), cert. den. 375 U.S. 951, 84 S.Ct. 440, 11 L.Ed.2d 313 (1963); Anderson v. Kelly, 32 F.R.D. 355 (S.D. La.1963); Hackett Kincade, 36 F.R.D. 442 (1964).

 Thus, for the lack of a proper class on either side, the second claim must be dismissed.[6] Nor does the theory of "ancillary jurisdiction" to the first claim supply the deficiency. Ancillary jurisdiction does not apply to the joinder of claims under Rule 18. Wright, Federal Courts, §§ 9, 19 and 78. The jurisdictional requirements must be met as to each separate cause of action and none is present here.

### III.

The action of this court in ordering desegregation of the penal institutions in all respects does much to answer the complaints raised about custodial practices. Such order will preclude assignment by race to any type facility, any program within a facility, or any rehabilitative effort of the system. Thus, if the effort is good it will be shared equally; if it is poor, it will be borne equally by black and white prisoners alike.

---

6. While this result renders unnecessary the need to consider employment rights to state or other public jobs, we are constrained to note that the situation is not clear. The equal employment provisions of the Civil Rights Act are specifically inapplicable to "the United States * * * or a State or political subdivision thereof." 42 U.S.C.A. § 2000e(b). Nor to "an agency of the United States, or an agency of a State or political subdivision of a State." 42 U.S.C.A. § 2000e (c). (But see Executive Order No. 11246, Sept. 24, 1965, as to the federal government.) Despite the urging of the Civil Rights Commission to amend the coverage to include states, such exclusion remains the firm policy of the Congress.

At trial, the theory was advanced that the Fourteenth Amendment grants such a right to a state or local job over and above any statutory fair employment provision. The cases are legion upholding state fair employment laws as *not* violative of the Fourteenth Amendment. E. g., Colorado Anti-Discrimination Commission v. Continental, 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1962). However, *in the absence of such laws, the status of* the question is not clear and we find no definitive opinion on the subject.

We are constrained to the view that such a right might exist in those state and local jobs sought to be filled on a civil service-merit-competitive basis. In such a situation, qualified persons ought not to be discriminated against by reason of race by the state. The inference is that such a right exists in this area. See Baines v. City of Danville, 337 F.2d 579 (2) (4th Cir. 1964); Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4th Cir. 1966). In this connection the state and local merit systems should take care that their records and "rules of threes" do not discriminate on account of race.

In the elective-appointive area, however, the process is entirely political. Each elected official must rise and fall on his performance and that of his appointed assistants. The courts would not presume to tell the President, or Governor, a Senator or Congressman that there are limitations on his cabinet or staff appointments. Similarly, other elected officials (such as the Sheriffs here) have freedom to choose such subordinates. The growing number of Negro appointees in Georgia is proof that such lack of discrimination is politically sage. Nevertheless, the power of an elected official to appoint freely appears inviolate, and the risk is his own choice.

Thus, pending further Congressional action or clarification by the courts, logic would dictate that the Fourteenth Amendment right to public employment is hybrid, existing in the civil service-competitive-merit area and not existing in the elective-appointive area.

Nevertheless, the plaintiffs go further and seek to abolish all county public works camps. The theory is advanced that certain state institutions offer academic and trade programs, while the public works camps offer only physical labor. Under such circumstances, it is contended that hard labor constitutes cruel and unusual punishment under the Eighth Amendment and involuntary servitude under the Thirteenth Amendment.

Again there is considerable doubt as to plaintiff's standing as representative of a class. The court is far from convinced that all prisoners at county public works camps would prefer being inmates at the Reidsville State Penitentiary. To the contrary, many prefer the comparative freedom, the proximity to their families, and the general association with less-hardened criminals in the works camps. Standing to proceed as a class on this basis has not been shown to the satisfaction of the court and the burden is clearly upon petitioner to do so. Chaffee v. Johnson, 229 F.Supp. 445(9) (S.D.Miss.1964), aff'd 352 F.2d 514 (5th Cir. 1965).

Moreover, there is a longstanding policy of the courts not to interfere in prison administration and discipline at any level. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1947); Tabor v. Hardwick, 224 F.2d 526 (5th Cir. 1955). And, there must be a clear abuse of discretion before the courts will do so. Walker v. Blackwell, 360 F.2d 66 (5th Cir. 1966). The location and type of institution to be established and the programs for each are basically matters for determination by the appropriate administrators. Of course, certain constitutional rights follow a person into state prison through the Fourteenth Amendment and among these is the protection of the Eighth Amendment against cruel and unusual punishment. However, a work camp per se does not constitute such "inhuman, barbarious or tortuous punishment" as to violate the Eighth Amendment. Such acts are specifically

barred by Georgia law. See Ga.Const. art. 1, § 1, par. 9; Code, § 2–109; Ga. Code § 77–311. Thus, it has long been held that hard labor as a penalty for crime is expressly permitted by the Thirteenth Amendment and not prohibited by the Eighth. United States v. Reynolds, 235 U.S. 133, 149, 35 S.Ct. 86, 59 L.Ed. 162 (1914); Butler v. Perry, 240 U.S. 328, 36 S.Ct. 258, 60 L.Ed. 672 (1916). In modern terms the answer is succinctly stated in Draper v. Rhay, 315 F.2d 193 (9th Cir. 1963), cert. den. 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153 (1963).

"There is no federally protected right of a state prisoner not to work while imprisoned after conviction, even though the conviction is being appealed. (hn 3.)

Prison rules requiring a prisoner to work do not impose involuntary servitude in violation of the Thirteenth Amendment. (hn 4)

A person who is held in a state penitentiary or county jail may be required to work in accordance with institution rules." (hn 7)

This is not to say that an individual cannot raise the question of his own particular treatment as being a violation of his constitutional rights, but each such case is personal and dependent on the particular facts. E. g., Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966). What we hold is that work and labor on the part of prisoners is not in itself unconstitutional or unlawful.

We are not dissuaded from this conclusion by the fact that Georgia's penal system includes an avowed "program of rehabilitation." Ga. Code § 77–319. Other than the constitutional rights which follow a man into confinement, no duty is absolutely owed a prisoner other than to exercise ordinary care for his protection and to keep him safe and free from harm. See Cohen v. United States, 252 F.Supp. 679 at 686, 687 and cited cases (N.D.Ga.1966). Humane efforts to rehabilitate should not be discouraged by holding that every

prisoner must be treated exactly alike in this respect. There is no general agreement among state or federal experts regarding the extent of rehabilitative efforts, but they are dependent upon variable factors such as length of sentence, prior training, psychiatric evaluations and the like. The new Georgia Classification and Assignment Center now under construction should do much to make the program more effective dependent upon the capabilities of each prisoner. To order the maximum for each and every person confined, as sought by plaintiffs here, would be financially prohibitive for this state and could result in a reduction of rehabilitative efforts rather than an implementation.

Accordingly, this complaint is likewise dismissed.

Upon consideration of the within and foregoing petition and in accordance with the written opinion filed this date,

It is the order, judgment and decree of this court that Georgia Code §§ 77–310(a); 77–108; and 77–9904 be and are declared violative of the Fourteenth Amendment to the Constitution of the United States to the extent that said statutes require segregation of the races in the prisons and jails of Georgia. Otherwise, said statutes shall remain in full force and effect.

It is further ordered that the Director of the Board of Corrections, the Director of the Board for Children and Youth, the several wardens of county public works camps, the several sheriffs of the state, and the several jailers of municipal jails, and their successors in office, take the necessary and appropriate steps to desegregate all penal institutions within the state, the various educational and training programs, the juvenile and youth centers, and all aspects of the same on or before January 1, 1969, unless otherwise ordered by the court.

In accordance with Rule 23, this action is adjudged to be a proper class action under (b) (1). Accordingly, the Clerk is directed to serve by registered mail a copy of this order upon the Director of the Board of Corrections, the Director for Children and Youth, the several Sheriffs of the State, the Wardens of each county public works camps, and the police chief of each incorporated municipality in the state. Such persons, their employees, agents, and subordinates and their successors in office are deemed to be members of the defendant class affected by this order under Rule 23(c) (3).

Each of said members is hereby granted 30 days to show cause, if any, in writing why said order should not be applicable to such party.

It is further ordered that the costs incurred in this proceeding be and they are hereby taxed against the defendants, but the Court is of the opinion that the state should pay such costs.

It is so ordered.

TUTTLE, Circuit Judge (concurring in part and dissenting in part).

I agree with the opinion of the court relating to the desegregation of custodial facilities so adequately treated in Judge Smith's opinion. I also agree that in the present state of the law there is no relief which this court can give in response to plaintiffs' demand that the court abolish all county public works camps, as dealt with in Section III of the court's opinion.

With deference, however, I cannot agree that the claim in the complaint, and dealt with in Section II of the opinion, is not properly before us for consideration for lack of standing on the part of the plaintiffs to raise the issue of racially exclusive hiring practices by the State Board of Corrections.

I agree that unless an individual Negro is a member of a class of persons who had actually sought and been denied an opportunity for employment, on the basis of race, he could not, as a potential employee, raise the issue of segregated hiring policy. Here, however, we have the issue raised by the thousands of Negro inmates of the correctional institu-

tions who ask the court to correct a system under which their supervision, custody, and rehabilitation, such as it exists [1] is administered by white persons exclusively. The foregoing opinion correctly calls attention to the fact that according to the latest statistics some 857 employees of the State Board of Corrections are white and 13 are Negroes. It also expresses a very plain, and, I think, necessary, caveat in footnote 6 ending with the statement, "In this connection the state and local merit systems should take care that their records and 'rules of threes' do not discriminate on account of race."

I think the plaintiffs here are entitled to more than the cautionary note because I think they, as affected individuals, are proper members of a class who have standing to complain of the present segregated practice prevalent in the institutions under the control of the State Board of Corrections.

It is the policy of the state of Georgia to make of its Department of Corrections a system for rehabilitating citizens. One of the rules adopted provides, "In addition to security considerations, it shall be the duty and the responsibility of all correctional personnel to do everything reasonably within their power to insure the reformation and rehabilitation of the individual inmate so that he may return to the community as a useful, law abiding citizen." Rules and Regulations Governing the Operations of State Correctional Institutions and County Public Works Camps in the State of Georgia, 15.

Moreover, in the annual report of the Board of Corrections dated July, 1965, is found the language, "The Department of· Corrections is working diligently to build a correctional system—rather than merely maintaining a prison system."

In the Board's Basic Policy, Procedures and Regulations, dated January, 1966, there are found the following instructions:

"Custody and security do not connote punishment and can be maintained with a constructive program of rehabilitation designed to help prepare inmates for a useful life in the community after release.

"The custodial officer has more contact with the inmates than any other employee or official of the Department. His function is basically restrictive but by his attitude in the performance of his functions he can have a significant effect on the inmates in his charge. A firm but fair attitude will help toward development of respect for and obedience to, the general rules governing the inmate population. He should bear in mind that in addition to his duties relating to custody and security he has a definite duty to assist in the overall Treatment Program."

While admittedly there are great gaps in all prision systems and the proof thus far adduced in this case indicates that the degree to which educational opportunities and the training of skills are afforded leaves much to be desired, it is nevertheless true that under the state announced policy it is the duty of the personnel who operate the custodial institutions to deal with and cope to such extent as they are able with the problem of rehabilitating Georgia's prison population for useful future life. To this extent then it seems clear to me that the court should permit adequate proof to be made with respect to the complaint made in Section II of the suit, in order that we may ascertain whether in fact the method of selection of employees which is now pursued deprives the inmates of

---

1. "The State Board of Corrections shall adopt rules governing the assignment, housing, working, feeding, clothing, treatment, discipline, rehabilitation, training and hospitalization of all prisoners coming under its custody.

"The Board shall also adopt rules and regulations governing the conduct and the welfare of the employees of the State institutions operating under its authority and in the county public works camps and state highway camps operating under its supervision * * *." Ga.Code Ann. Section 77–307(b) (c).

substantial Fourteenth Amendment rights to have the "faculties," as we may denote the training and administrative personnel dealing with rehabilitation, selected other than on a racially segregated basis. This would follow from several decisions of courts which hold that entirely apart from the right of a Negro teacher to insist on non-segregated employment practices, Negro pupils themselves have a right to have a non-segregated faculty or teaching staff. United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836, 883–886, 1966, aff'd on rehearing en banc, 380 F. 2d 385, cert. denied 389 U.S. 840, 88 S. Ct. 67, 19 L.Ed.2d 103, 1967. In Lee v. Macon County Board of Education, 267 F.Supp. 458, at page 472, M.D.Ala., aff'd sub nom, Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422, the three-judge district court in the Middle District of Alabama said: "It is no longer open to question that faculty and staff desegregation is an integral part of any public school desegregation plan—not because of teachers' employment rights, but because students are entitled to a nonracial education, and assignment of teachers to students on the basis of race denies students that right."

For these reasons I would permit the plaintiffs to complete their statistical study, which, it seems, might demonstrate the truth of their complaint that with some notable exceptions,[2] defendants operating institutions named in the class action are, in fact, operating the entire system under their care solely by members of the white race, whereas an overall average of 56% of the inmates are of the Negro race. If the proof shows such facts, I am of the opinion that the plaintiffs would be entitled to have this practice ended in the same manner as have those school districts which have operated their faculties on a segregated basis. The means by which this result could be accomplished could be developed without doing violence to any basic employment rights of other persons, and I am confident, without any interruption in the proper operation of the custodial institutions involved.

I, therefore, dissent from that part of the opinion stating, "thus, for the lack of a proper class on either side, the second claim must be dismissed," because the plaintiffs adequately represent their class as alleged, and at least the Board of Corrections is a proper party defendant as to its employment practices.

---

**2.** I, of course, do not intend to prejudge the facts as to any individual county or prison system as to which there has been a denial of racial hiring.