Dr. Harry W. THERIAULT, Bishop, Church of the New Song of Universal Life, and Rector, The Fountainhead Seminary, and Rev. Jerry Mack Dorrough, Vice-Rector, The Fountainhead Seminary, and Minister, Church of the New Song of Universal Life, et al.

v.

Norman A. CARLSON, Director, Bureau of Prisons, et al.

Civ. A. No. 13872.

United States District Court, N. D. Georgia, Atlanta Division, Jan. 22, 1973.

Harry W. Theriault, pro se.

Jerry Mack Dorrough, pro se.

Glenn Zell, Atlanta, Ga., Juan Manuel Ramirez, El Paso, Tex., for plaintiffs.

John W. Stokes, U. S. Atty., P. Bruce Kirwan, Asst. U. S. Atty., Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

While incarcerated in the United States Penitentiary at Atlanta, Harry W. Theriault, a convicted thief and self-proclaimed escape artist, claims to have started a new faith or church known as the "Church of the New Song".[1] Declaring as its source certain obscure passages from the Book of Revelations in the New Testament Bible, the Church of the New Song concerns itself with a supreme spirit known as "Eclat" and espouses, in general, a doctrine of brotherhood and love. When he was thwarted in his attempts to arrange communal services for his church, Theriault filed a Rule 23(b)(2)-type class action in this court seeking, among other things, equal religious rights for the members of the Church of the New Song. The original petition was co-signed by 165 inmates at the Atlanta federal penitentiary. In due course extensive hearings were held in this court.

The evidence at the hearings revealed that Theriault's idea for a new religion began as a game or joke, but that after some reflection his inspiration became real. A prison official from the federal penitentiary in Marion, Illinois, to which Theriault was transferred as soon as the class action was filed, admitted on the stand that when Theriault was received at Marion his activities were truly religious in nature. While at Marion Theriault, through divers occult and prophetic powers which he claims, was able to develop a theology and church hierarchy, complete with its own written bible and clergy. The clergy, beginning with Theriault himself as the "Bishop of Tellus", bore new but episcopal-sounding titles, degrees, and commissions, all conferred by Theriault himself without any necessity for previous formal instruction, training, or study. Theriault's own "degree" was obtained originally from a mail-order house in California.

Theriault's message was addressed almost exclusively to prisoners and former prisoners and, as might be expected, most of his officers and members are still behind bars.

From the outset the prison officials have taken a dim view of Theriault's movement, branding it a fake and a fraud supported only by a group of the most hardened criminals in federal custody. They refused to permit him to conduct religious services in the prison solely on the ground that his religion was not "recognized", and when he first asked for and then demanded equal time with other religions they placed him in punitive segregation.

These attempts at suppression, however, appear to have only caused the movement to spread, which seems to be the history of such cases. Compare, for example, the experience of Pontius Pilate in dealing with Jesus of Nazareth where the charges were almost identical.

After considering all the evidence and researching the legal precedents, the court concluded that neither it nor the defendant prison authorities, if indeed anyone, has the power to finally say, under the First Amendment, what is or is not a worthy religion, the question being ultimately not one for debate or proof so much as one of faith and conscience. The court also concluded that the Church of the New Song, despite the character of many of its members, was at least as meritorious as certain other sects which, after conclusive legal battles, must now be "recognized" by the prison authorities. *E. g.,* Cruz v. Beto, 445 F.2d 801 (5th Cir. 1971), vacated and remanded per curiam, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Cooper v. Pate, 324 F.2d 165 (7th Cir. 1963), reversed, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

Being of this view the court first held that the insistence of the defendants that plaintiffs meet some standard of

---

1. Details may be found in the court's published order of February 25, 1972 in this case. Theriault v. Carlson, 339 F.Supp. 375 (N.D.Ga.1972), appeal docketed, No. 72-2592, 5th Cir., July 25, 1972.

be defendants themselves runs squarely afoul of the freedom of exercise clause of the First Amendment, and further found as a fact that the "sole basis for religious "recognition" established only the punitive segregation of Theriault was his demand to hold religious services." The court therefore entered an order and injunction against defendants, providing in part as follows:

"(2) Respondent Carlson and respondent Silber are ordered to direct prison authorities under their jurisdiction to grant petitioners the right to freely exercise their religion, including the right to correspond with petitioner Theriault for the purpose of seeking spiritual guidance, as regulated by Bureau of Prisons Policy Statement 7300.43A and in accordance with the opinion of this court;

(3) Respondent Henderson is hereby ordered to immediately release petitioner Theriault from confinement in punitive segregation and restore him to the general prison population; and

(4) Respondent Carlson is hereby ordered to instruct prison authorities under his jurisdiction that they may not reimpose confinement in punitive segregation upon petitioner Theriault unless Theriault violates an institutional rule or regulation requiring such confinement subsequent to the date of this opinion and order or incites riot or insurrection during the conduct of his religious activities subsequent to the date of this opinion and order."

The order also contains some additional provisions, none of which, however, are pertinent to the present controversy.

Thereafter, on the 27th day of March, 1972, the plaintiffs filed a further petition in this court alleging several direct violations by the defendants of the portions of the prior order set out above, and praying that the defendants be adjudged in contempt of court for disobeying the prior order and that they be punished accordingly.

The first alleged violation of the order is that the defendants failed to release Theriault from punitive segregation as ordered by the court in paragraphs 3 and 4 of the order, but instead kept him in such segregation after the date of the order, both in Atlanta and later at the federal prison institution at LaTuna, Texas, to which he was transferred.

After much evidence and with some lingering doubt, the court concludes that at the present hearing the plaintiffs simply have not carried their burden of showing a contemptuous violation of this part of the order.

The order was signed on Friday afternoon, February 25, 1972. Frequently this court has no time to read and sign orders until after the other daily business of the court is over—many times after the Clerk's Office is closed. While the court has no specific recollection of what happened in this case, it is entirely possible and even likely that on this occasion the Clerk's Office was closed and that the order did not get to the Clerk's Office for processing and mailing until Monday, February 29th. Considering the present state of the mails, it is also likely that it did not arrive at the prison for several days thereafter.

■■ In any event, the prison officials swear, and the court has no reason to doubt their testimony, that a copy of the order was not actually received at the prison until the afternoon of Wednesday, March 1st. The prison authorities also testify that prison policy is that they never move a prisoner even under the order of a court until a copy of the order is actually in their hands. Considering their responsibility for prisoners in their custody, the court concludes that this is a reasonable rule. The matter is further complicated, however, by the fact that on Wednesday afternoon, even after the order was received at the prison, the defendants still did not release Theriault from segregation except to remove him from his segregated cell into a waiting automobile to be transported to LaTuna, the prison officials in the meantime having been

ordered by Washington to carry out such a transfer. Moreover, to complicate matters still further, the plaintiffs insist that Theriault was not released from segregation even after arriving at LaTuna. At the hearing, the court investigated this part of plaintiffs' claim thoroughly, and what appears is this. By the time Theriault arrived at LaTuna he had grown a beard, and upon his reception at that institution he was asked to shave his beard as a condition of his being released into the general prison population, it appearing that a valid prison regulation prohibits the wearing of beards at that institution. Theriault refused to shave his beard and for this reason was retained in segregation. Under the previous order this, of course, was perfectly permissible. Although the evidence here is not entirely without conflict, Theriault in substance admits that this is what happened. It also appears that after remaining in segregation at LaTuna for four days, he then agreed that he would shave his beard and thereupon he was removed from punitive segregation, although he further complains that even thereafter he was kept in a deadlocked (isolated) cell except that he was released to population to obtain his meals, and so forth.

Under all the circumstances, the court gives to the defendant prison authorities the benefit of the doubt and finds that there was no contemptuous violation of paragraphs 3 and 4 of the previous order.

The alleged violation by the Director of the Bureau of Prisons and the other defendants of paragraphs 2, 3 and 4 of the order is an entirely different matter. The court had thought that the meaning of paragraph 2 of the order was about as clear as the English language could make it. In previous portions of the opinion the court had clearly held that the defendants had unconstitutionally interfered with the free exercise of their religion by petitioners. Then paragraph 2 of the order says in plain, simple, two-syllable English that defendants Carlson and Silber "are ordered to direct prison authorities under their jurisdiction to grant petitioners the right to freely exercise their religion, including the right to correspond with petitioner Theriault for the purpose of seeking spiritual guidance. . . ." However, purporting to act under what they refer to as "advice of counsel" the defendants Carlson and Silber simply did not obey this direction. The words "their religion" as used in this order plainly mean, and were intended to mean, the same thing with respect to this church as they mean with respect to any other prison church group such as Baptists, Methodists, Roman Catholics or Jews, including not merely those named as parties in court but all others in the prison population, past, present or future, who indicate allegiance and dedication to such denomination. In the same way the plain direction to defendants Carlson and Silber that they "direct prison authorities under their jurisdiction" to afford relief means that they were to so direct *"all"* authorities under their direction. It gave defendants no discretion to pick and choose. Instead of giving such directions to all of their subordinates in the various prisons, the defendants notified only those at Atlanta, LaTuna, and, apparently, Marion.

As presented to the court by a representative of the General Counsel to the Bureau of Prisons, the position taken by the Bureau was that paragraphs 2 and 4 of the court's order applied only to those institutions in which the named petitioners—Theriault, Dorrough, and, presumably, the other 165 inmates who signed the original petition—were incarcerated. According to the Bureau, this group was to be found to date only in Atlanta, LaTuna, and Marion.

Aside from the fact that it completely ignores the class action aspect of the case, the position taken by the Bureau is not the one taken by the respondents in response to the original contempt motion. The original contempt motion filed by Theriault specified, among other things, that a letter containing spiritual advice which he had mailed to an

inmate at the Federal Prison Camp, Eglin, Florida, had never been delivered. In their response to the court's show cause order, filed April 24, 1972, respondents admitted that the letter had not been delivered but said that it was a "mistake" because the warden at Eglin had not been made aware of this court's order. Respondents then urged the court not to find them in contempt "since steps have been taken to comply with the Court's Order." Respondents attached a copy of a memorandum sent from the superintendent at Eglin to the Bureau's General Counsel which stated that at the time Theriault's letter was received at Eglin it "was returned as we were unaware of the Judge's order pertaining to the case. We have now familiarized ourselves with the Judge's order and will promptly forward any religious mail from Theriault to the addressee." Respondents also attached a copy of a memorandum from the warden at La-Tuna to the Bureau's General Counsel which stated, with reference to Theriault's letter to Eglin: "Apparently Eglin had not received a copy of the court order and we felt that it was an honest mistake on the part of Eglin's staff. Mr. Theriault forwarded the letter to the court before we could advise him that we felt it was a mistake and could be corrected. We believe the situation occurred *before a copy of the court order was disseminated to all institutions.*" (Emphasis added.) Thus it would appear that, at least in April, respondents were not reading the court's order in a fashion that would limit paragraphs 2 and 4 to Atlanta, LaTuna, and Marion.

■■ In his attempt to explain his "advice" to the defendants,[2] the representative of the General Counsel expressed before the court deep concern and a cautious approach lest the order be construed by his clients so as to exceed this court's jurisdiction. But clearly there can be no question that the court had jurisdiction to order defendants Carlson and Silber to direct prison authorities under their control to grant petitioners the right to freely exercise their religion. The court assumed jurisdiction of this action under 28 U.S.C. § 1361 and venue was provided by 28 U.S. C. § 1391(e)(4). The fact that defendants' subordinates resided in judicial districts located in other parts of the country did not obviate defendants' duty to comply with the court's order. There is nothing novel about a court order which directs an administrator to make certain changes in the organization under his control, and whose implementation ultimately affects subordinates who are beyond the geographical limits of the court's district. *See* Landman v. Royster, 333 F.Supp. 621 (E.D.Va. 1971); Anderson v. Ellington, 300 F. Supp. 789 (M.D.Tenn.1969); Adderly v. Wainwright, 46 F.R.D. 97 (M.D.Fla. 1968); Wilson v. Kelley, 294 F.Supp. 1005 (N.D.Ga.1968), aff'd 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425; Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967), aff'd 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422; United States v. State of Texas, 321 F. Supp. 1043 (E.D.Tex.1970), aff'd 447 F.2d 441 (5th Cir.); United States v. State of Georgia, 428 F.2d 377 (5th Cir. 1970); Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561 (1970).

■ Nor can it be seriously maintained that the relief granted could extend only to those inmates who were members of the Church of the New Song at the time the order was issued. In this case, as in many actions "in the civil-rights field where a party is charged with discriminating unlawfully against a class," Committee's Notes to Revised Rule 23, 3B Moore's Federal Practice, ¶ 23.01[10–2] (2d ed. 1969), and cases cited therein, membership of the plaintiff class is not static but consists of, *all members of the church* whether or not

---

2. Reliance upon advice of counsel is no defense to an act of contempt, although it may be a factor for the court to consider in mitigation of punishment. E. g., United States v. Goldfarb, 167 F.2d 735 (2d Cir. 1948).

they were members at the time this lawsuit was brought. *See* Adderly v. Wainwright, *supra*; Wilson v. Kelley, *supra*; Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971), aff'd 456 F.2d 854 (6th Cir.) Hamilton v. Love, 328 F. Supp. 1182 (E.D.Ark.1971). To accept the government's contention to the contrary would have the court affirmatively sanction, against new members of the church, the religious discrimination which it condemned against the old. Ten years ago the construction now urged by the government, and the necessary consequences to the class, were rejected by the Fifth Circuit Court of Appeals, Potts v. Flax, 313 F.2d 284 (5th Cir. 1963). The court fails to see why this construction should now be accepted, or for that matter how, in the first instance, it could have been seriously advanced.

 Finally, the government had not reason to fear for the court's jurisdiction over a class whose members were incarcerated throughout the United States. It is well settled that named plaintiffs from only a small part of the class can adequately represent geographically dispersed members of the class. Rosado v. Wyman, 322 F.Supp. 1173, 1191 (S.D.N.Y.1970), aff'd 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157. *See* Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968); Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R. D. 452, 462 (E.D.Pa.1968); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722, 724 (N.D.Cal.1967). And while geographic distribution of the class may bear on the problem of representation, "it certainly has nothing to do with the court's jurisdiction to entertain relief with respect to matters which affect the class." Rosado v. Wyman, *supra*. *See, e. g.*, West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir. 1971), and cases cited above. Of particular relevance to the present contempt proceeding, it is equally well established that where the respondent is properly before

the court, the district court decree is binding upon the respondent, not simply within the local district, but throughout the United States. To paraphrase the Court in Leman v. Krentler-Arnold Co., 284 U.S. 448, 452, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1931), "Disobedience constitute[s] contempt of the court which render[s] the decree, and [is] none the less contempt because the act [is] committed outside the district, as the contempt [lies] in the fact, not in the place, of the disobedience to the requirement."

██ This court neither has nor claims jurisdiction over every controversy which may break out in other districts or other prisons between these parties, any more than it claims universal jurisdiction over all similar controversies with Catholics or Jews. Nor has it attempted to issue any binding orders on anyone not before this court. On the facts developed before them other district courts may disagree with this order and reject it in toto. Appellate courts may reverse it. The decision of this court and the apparently contrary opinion rendered in the Western District of Texas [3] are already on appeal in the Fifth Circuit. So rapid has been the spread of Theriault's movement that in at least one district a motion has been filed to put the whole question of the church before a multi-district panel. But the defendants here were actually and properly before this court and appeared and testified. All they were directed to do was give directions to their subordinates. Upon the pleadings, upon the law and upon the facts the court concludes that a justiciable case was presented by petitioners which it was the sworn duty of this court to decide. It did so and the defendants did not obey. The court therefore finds the defendants Carlson and Silber guilty of a civil contempt of this court for violating paragraph 3 of the court's order of February 25, 1972.

The court has spent much time and delayed this opinion for many days

3. Theriault v. Silber, No. 13–1182, appeal docketed, 5th Cir. Jan. 18, 1973.

while considering what remedy and what punishment would be appropriate. It goes without saying that orders of a court having jurisdiction of the parties and subject matter must be obeyed, not because of any fancied omniscience of the judge but because obedience to law constitutes the very warp and woof out of which an orderly and practical civilization is necessarily formed.

The court has considered the claimed and obvious expertise of the defendants in the field of prison matters. On the other hand, the court is constrained to observe that the precise question here presented is not so much one of penology as of constitutional law, and in this area the views of the defendants have been of singularly little value, expressing as they do not only no acceptable answers but not even an understanding of the basic problem.

 Defendants Carlson and Silber are guilty of contempt, but because the underlying issues in this case have yet to be decided on appeal the court will defer punishment until after a final appeal of the case has been concluded.

Lastly, Theriault and the members of his church claim that prison officials at their institutions have denied them numerous religious rights and privileges, including worship service rights and visitation privileges, which are allegedly granted in routine fashion to inmates who are adherents of other faiths. These claims amount to a charge that the prison officials involved have not been applying Bureau of Prisons Policy Statement 7300.43A in an equal manner.

 Insofar as Theriault is concerned, these claims will not be considered by this court. Theriault is now an inmate at LaTuna, Texas, and whether prison officials at LaTuna have been complying with their legal obligations or have been denying Theriault his constitutional rights since he was transferred there is something to be litigated in courts which have jurisdiction over the officials at LaTuna. This court is not one of them.

Insofar as the claims of the members of the church in Atlanta are concerned, the court has carefully reviewed all the testimony and evidence adduced at the contempt hearings, including the testimony of various inmates, civilians, Associate Warden J. D. Riggsby, and Warden J. D. Henderson, and concludes that there is no basis for holding any of the Atlanta prison officials in contempt with respect to those claims.

Paragraphs 2 and 4 of the original order shall be rewritten and republished in the following language with directions to defendants Carlson and Silber to carry them out as written:

"(2) Respondent Carlson and respondent Silber are ORDERED to direct *all* prison authorities under their jurisdiction to grant petitioners and all other acknowledged members of the Church of the New Song the right to freely exercise their religion."

"(4) Respondent Carlson is hereby ORDERED to instruct *all* prison authorities under his jurisdiction that they may not re-impose confinement in punitive segregation upon petitioner Theriault or other members of the Church of the New Song unless he or they violate an institutional rule or regulation requiring such confinement subsequent to the date of this opinion and order or incite riot or insurrection during the conduct of their religious activities subsequent to the date of this order."

Within ten days from this date the defendants shall file with the Clerk of the Court complete facsimiles of the directions so given, together with a list of the institutions and persons to whom addressed, showing in each case how delivery was made.

It is so ordered.