OPINION OF THE COURT
Joseph G. Golia, J.
As the Trial Judge in this case, I had the opportunity not only to listen to all the testimony and hear all the facts in this case, but I also had the opportunity to observe the *538 defendant, both during the times that the jury was in the courtroom as well as when the jury was not present.
I saw the defendant attempt to stare down the Assistant District Attorney, the family members of the deceased, as well as several of the witnesses in this case. Indeed, I observed a contest of "wills” between this defendant and a certain witness in which the witness maintained eye contact with the defendant until she was nearly out of the back door.
In addition, I was informed on several occasions during the course of this trial that Mr. Johnson made comments to the family of the deceased and to the Assistant District Attorney. Although I did not personally hear most of those comments, Mr. Johnson acknowledged that he did make a comment but assured me that it was innocent, polite and friendly. However, given the one obscene comment that I was able to hear, I do not believe that all the other comments were friendly and wholesome.
I do acknowledge that, with the exception of these comments, the defendant’s demeanor in court has, for the most part, been quiet and respectful to the Bench.
However, his otherwise polite and soft-spoken demeanor belies the cruel, cold, heartless murderer that is presently awaiting sentence.
As the jury has found, this defendant, while waiting to commit a robbery of a grocery store, noticed the deceased closing up his butcher shop and decided to rob him instead. The defendant went up to his victim, draped his arm around Mr. Arce’s shoulders in a sign of camaraderie, and instead of a friendly nudge to the jaw, shot Tony Arce through the head at point blank range.
And, as if that was insufficient, as Tony Arce attempted to run for his life, the defendant and his cohorts fired many more shots at him and, when Mr. Arce finally stumbled out of the line of fire, Mr. Johnson opines that he hopes the " 'mother fucker’ is dead so he can’t identify us”.
The People presented four witnesses who clearly and unequivocally placed the defendant at the scene, one of whom was in such frighteningly close proximity that she felt the powder residue of the shot. They also offered the defendant’s own statement wherein he acknowledges his presence at the incident but minimizes his involvement.
However, despite this overwhelming evidence of his guilt as *539 well as his signed statement, Mr. Johnson took the witness stand and denied his involvement, denied his presence at the scene, and even denied having ever been in this area of Queens County. And then, in what amounts to the ultimate temerity, he tells the jury that at the time of the incident he was at home with his mother who, he further informs the jury, has just recently died.
He further testifies that he did not make the statement attributed to him and that his signature appears thereon only because the police tricked him into signing several blank pieces of paper at various locations on the paper for the stated purpose of obtaining a handwriting exemplar.
Although I could continue to address the circumstances surrounding the trial, I believe that I have said enough about it.
I do wish to briefly acknowledge the letters that I have received from friends and family of Tony Arce, as well as the moving statement made by his wife in court today.
While the value of such statements is always important to help define the life that was lost, I found the full measure of the man within the testimony of Officer Jordan who knew him since she was seven years old as the helpful and friendly neighborhood butcher.
The value of Tony Arce’s life was clearly reflected in her tears as she described witnessing an esteemed neighborhood fixture being destroyed.
It is in view of these circumstances that I must look not once, not twice, but many times at what constitutes a proper sentence for this cold-blooded murderer who so arrogantly destroyed so much.
After substantial consideration I find that a term of imprisonment at hard labor is the only appropriate sentence to be meted out.
Under New York State law, the decision as to whether or not a defendant should be required to perform hard labor while incarcerated is left to administrative prison officials. This was not always the case and compelling reasons exist as to why the decision concerning hard labor should be left to the trial court.
At common law, the sentence of hard labor was quite rare. Put simply, the ordinary common-law punishment for almost all felonies was death by hanging; the exceptions being petty *540 larceny, rape and mayhem.[1] Thus, death was the award for almost any felony, barring a specific statute to the contrary. With the advent of modern criminal and penal codes, the death sentence has been reserved for only the most serious of crimes; indeed there is no death sentence presently available in this State. Accordingly, imprisonment is the preferred form of punishment.[2]
Federal authority has long established that there is no constitutional defect in requiring a prisoner to perform hard labor while incarcerated. (United States v Reynolds, 235 US 133, 149; Butler v Perry, 240 US 328.) One of the more modern expressions of the Federal judiciary’s position on hard labor is provided by Draper v Rhay (315 F2d 193, 197 [9th Cir]) which held, in part, the following:
"There is no federally protected right of a state prisoner not to work while imprisoned after conviction, even though that conviction is being appealed.
"Prison rules may require [a prisoner] to work but this is not the sort of involuntary servitude which violates Thirteenth Amendment rights.”
Similarly, Wilson v Kelley (294 F Supp 1005, 1012) held that no duty is owed to a prisoner other than to exercise ordinary care for his or her protection. The court went on to explain that the requirement that a prisoner perform hard labor in no way violates any of a prisoner’s rights, nor does it violate any duty owed to a prisoner. This line of cases thus clearly establishes that a State may require its prisoners to perform hard labor without constitutional defect.
Many States recognized the use of hard labor as part of a prisoner’s sentence in their Constitutions or early statutes.[3] The State of New York has, throughout this century, required that convicted prisoners perform hard labor. The New York Penal Law of 1909 in section 2183 specifically stated: "Where a person is convicted of a crime, for which the punishment inflicted is imprisonment for a term exceeding one year, or is sentenced to imprisonment for such a term, the imprisonment must be inflicted by confinement at hard labor in a state *541 prison”.[4] This section, which essentially mandated a sentence of hard labor for all felonies, remained substantially unchanged until 1971 when the New York criminal laws were amended. Section 2183 was replaced by section 70.20 which states as follows: "(1) Indeterminate sentence. Except as provided in subdivision four of this section, when an indeterminate sentence of imprisonment is imposed, the court shall commit the defendant to the custody of the state department of correction for the term of his sentence and until released in accordance with the law”.[5] In so rewriting this section, the legislative provision that prisoners be confined at hard labor was removed. New York Correction Law §§ 500-d and 171 now govern the labor of prisoners while incarcerated.[6]
It is interesting to note that under New York law only the Commissioner of the Department of Correctional Services and the Warden of a particular correctional institution are specifically empowered to require hard labor of inmates confined to State correctional facilities, while section 500-d of the Correction Law gives the Trial Judge such authority where inmates are to be incarcerated in a county jail. While section 171 specifically empowers correctional institution administrators to compel hard labor, nothing in this section prohibits a Trial Judge from sentencing a defendant to hard labor in a State facility.
For reasons of equal protection under the law, these sec *542 tians must be read so as to allow all trial courts the right to impose hard labor through their sentences. The Equal Protection Clause of the United States Constitution, as interpreted by New York courts, forbids the State from treating similarly situated persons differently or enacting laws which make distinctions between people without a rational basis. (Matter of Abrams v Bronstein, 33 NY2d 488; People v Utica Daw’s Drug Co., 16 AD2d 12 [4th Dept]). If only certain trial courts are forbidden from imposing a sentence of hard labor upon inmates in State correctional facilities, an equal protection problem arises. Specifically, section 500-d of the Correction Law, which allows a Judge to sentence hard labor to the county prisons, is not mirrored in section 70.20 of the Penal Law or section 171 of the Correction Law. This law thus facially makes a distinction between those defendants sentenced to county correction facilities, and those who are sentenced to State facilities. This distinction is not rational. Indeed, it would strain reasoning to accept that a Judge can sentence a defendant to hard labor in a local jail but not in a State prison.
There is no reason, logical or otherwise, why these sections of New York’s criminal laws should be read in such a way as to prohibit a Trial Judge from imposing hard labor. The legislative history of the amendments which changed the New York Criminal Code, states: "[T]he purpose of this bill is to accommodate the Code of Criminal Procedure to the revised Penal Law, the vast majority of amendments proposed in this bill are only of a formal nature”.[7]
In addition, nothing in the legislative history of this bill indicates a specific intent to deprive certain trial courts of the power to sentence a defendant to hard labor.
In order to determine the legislative intent in revising the old Criminal Codes, this court must employ several generally accepted rules of statutory interpretation. Section 381 of 73 American Jurisprudence 2d, Statutes explains that a statute containing a provision which repeals a previous legislative act, "operates only as a declaration of what would be the legal effect of the act without the provision, and does not permit to be engrafted on this express declaration of legislative intent an implication of more extensive repeal”. American Jurispru *543 dence further explains that repealed statutes may be used as an aid in interpreting existing statutes.
As this court has previously explained, when the Legislature updated New York’s Criminal Code and removed section 2183 of the old Penal Law (which mandated hard labor in sentences), the power to sentence a defendant to hard labor was preserved in section 500-d of the Correction Law on the County level. When this law is read in conjunction with the requirements of equal protection and the rules of statutory interpretation, the unavoidable conclusion is that this court retains its authority to sentence a defendant to hard labor.
From a logical standpoint there are several other valid reasons why all Trial Judges should be so empowered. Administrative prison officials are relatively removed from the actual facts and circumstances surrounding a particular case. They have no way of knowing what information was not put into their records or what public effect or reaction a particular defendant’s actions resulted in. Indeed, of all the public officials involved in the criminal justice system, the Trial Judge is in the best position to know all of the facts and circumstances surrounding a particular case. The trial court has before it the complete record, including that which does not reach prison officials, such as the demeanor of the witnesses and most importantly, the defendant. Furthermore, the Trial Judge is usually aware of that degree of notoriety and public concern a particular case has generated. Although such circumstances do not serve as a deciding factor, they do enter into the mix of what constitutes all the circumstances of a particular case. Finally, the Trial Judge conducts a lengthy and probing examination of each defendant in each case. The nature of this examination allows the Trial Judge to learn more about a defendant than an administrator could in the State correctional facilities.
For all of these reasons, New York law can be interpreted in such a way as to permit the trial court, through its sentence, to impose the specific enhanced punishment of hard labor.
Finally, it must be pointed out that permitting trial courts to make such judgments would in no way compromise the rights of any particular defendant. Indeed, by allowing the trial court to make hard labor determinations, the enhanced sentence could be reserved for the most egregious of offenders. This is preferable to only permitting prison officials to make *544 relatively removed determinations on this issue. Such a system would be both more just and more fair to all of the parties involved.
If a defendant becomes ill, or must be moved for administrative or safety reasons, prison officials should, of course, have the final say.
Lastly, with regard to this defendant, his statement sums up his being: "I hope the 'mother fucker’ is dead so he can’t identify us.”
Accordingly, the defendant is sentenced to the term of 25 years to life for the first and second counts of the indictment, and 5 to 15 years for the third count of the indictment, to be served consecutively to the first two counts, and to serve the terms imposed at hard labor under the control of the Commissioner of Corrections of the State of New York.

. 1 Bishop, Criminal Law, Book VIII, ch LX, § 935 (7th ed).

. Id., at §§ 933-935.

. 19 Merrill, American and English Encyclopedia of Law, at 89 (1892); see, Ala Const, art I, § 33; Miss Const of 1869, art I, § 19; Stimson’s Stat Law of Cal, § 141, New York-Birdseye’s Revised Stat at 2319; NC Const, art II, §§ 1, 2; Stimson’s Stat Law of Cal, § 141; Mass Stat of 1827, ch 118; Mich Stat of 1842, at 130.

. Gilbert’s, Criminal Law and Procedure, art 196, § 2183 (1918).

. Penal Law § 70.20.

. Correction Law §§ 500-d, 171. Section 500-d states, in part, as follows: "Such keeper shall cause each prisoner committed to his jail for imprisonment under sentence, to be constantly employed at hard labor when practicable, during every day, except Sunday * * * Such keeper may, with the consent of the board of supervisors of the county, or the county judge, from time to time, cause such of the convicts under his charge as are capable of hard labor, to be employed outside of the jail * * * in building and repairing the highways * * * or in preparing the materials for such highways * * * and in cutting wood and performing other work which is commonly carried out at a prison camp * * * and the courts of this state are hereby authorized to sentence convicts committed to detention in the county jails to such hard labor as may be provided for them by the boards of supervisors. This section as amended shall not affect a county wholly included within a city.”
Section 171 of the Correction Law provides, in part, as follows: "The commissioner of correctional services and the superintendents and officials of all penitentiaries in the state may cause inmates in the state correctional facilities and such penitentiaries who are physically capable thereof to be employed for not to exceed eight hours of each day other than Sundays and public holidays.”

. Mem of Temp Commn on Rev of Penal Law and Criminal Code, 1967 NY Legis Ann, at 18-19.