Loveman **MARABLE**, by his brother and next friend, Bert Marable, et al., Plaintiffs,

v.

**ALABAMA MENTAL HEALTH BOARD**, a public corporation, et al., Defendants.

**STATE OF ALABAMA** ex rel. MacDonald **GALLION**, Attorney General of Alabama, Plaintiff,

v.

Robert H. **FINCH**, as Secretary of the Department of Health, Education and Welfare of the United States, et al., Defendants.

**UNITED STATES** of America and Robert H. Finch, as Secretary of the U. S. Department of Health, Education and Welfare, Counter-claimants,

v.

**STATE OF ALABAMA** ex rel. MacDonald **GALLION**, Attorney General of Alabama, et al., Counter-defendants.

Civ. A. Nos. 2615–N, 2610–N.

United States District Court
M. D. Alabama, N. D.
Feb. 11, 1969.

Jack Greenberg, Michael Meltsner and Conrad K. Harper, New York City, Demetrius C. Newton and Orzell Billingsley, Jr., Birmingham, Ala., for plaintiffs Marable and others.

MacDonald Gallion, Atty. Gen., Robert F. Miller, Bernard F. Sikes, and Jamie Pettigrew, Asst. Attys. Gen., State of Alabama, Montgomery, Ala., for Alabama Mental Health Bd. and State of Ala.

Stephen J. Pollak, Asst. Atty. Gen., David L. Rose and Harold Himmelman, Attys., Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., Ben Hardeman, U. S. Atty., Montgomery, Ala., for the United States and Robert H. Finch, Alanson W. Willcox, Gen. Counsel, Edwin Yourman, Asst. Gen. Counsel, and Marilyn G. Rose, Atty., U. S. Dept. of Health, Education and Welfare, Washington, D. C., of counsel.

Before GODBOLD, Circuit Judge, and JOHNSON and PITTMAN, District Judges.

JOHNSON, District Judge:

These consolidated cases involve racial discrimination and segregation in the operation of Alabama's mental institutions. This long and complicated litigation over a rather straightforward prob-

lem was initiated by a complaint filed by the State of Alabama November 17, 1967, seeking a declaration of Alabama's rights under § 602 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1. In its complaint (Civil Action No. 2610–N) Alabama maintains that defendants, officers and employees of the United States Department of Health, Education and Welfare (hereinafter HEW), acted arbitrarily and in excess of their authority in withholding federal financial assistance for noncompliance with the non-discrimination requirements of Title VI.

Before the defendant HEW officials responded, plaintiffs Loveman Marable, et al., patients at several of the institutions involved, and their next friends brought a class action seeking an injunction against racial discrimination in the operation of mental health facilities by defendants, the Alabama Mental Health Board, its members and its employees, in violation of plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and 2000d (Civil Action No. 2615–N).

The defendant HEW officials then filed an answer and a counterclaim to enforce 42 U.S.C. § 2000d, 45 C.F.R. Part 80 and 7 C.F.R. Part 15. Named as additional counterdefendants were the Alabama Department of Mental Health, the Alabama Mental Health Board, and their members and employees. A motion by the United States of America for leave to intervene in this counterclaim was granted by formal order of this Court January 2, 1968.

Three-judge courts, identical in composition, were empaneled in these cases. In response to a motion by the State of Alabama and the Alabama Mental Health Board, et al., the two cases were ordered consolidated. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1345, 1346, and 2201.

The private plaintiffs in 2615–N and the defendants and counterclaimants in 2610–N have moved for summary judgment pursuant to Rule 56. By agreement of the parties, the cases are being submitted to the Court on the basis of the motions for summary judgment, the record of the administrative proceeding conducted by HEW in regard to the Alabama mental health system, docketed as MCR–44, and certain stipulations of the parties. It is accordingly conceded that there are no genuine issues of material fact and that the only issues in dispute are issues of law.

I

FACTS

The State of Alabama, through its Department of Mental Health, operates a mental health system for its mentally ill and mentally retarded citizens. The Alabama Department of Mental Health is composed of the Alabama Mental Health Board, the State Mental Health Officer, and such divisions and administrative sections as the Board directs be created.[1] The Board, established as a public corporation composed of the Governor of Alabama and thirteen public trustees, subject to confirmation by the Alabama State Senate,[2] supervises, manages, and has full control over the system, including the State-owned institutions of Bryce Hospital, Searcy Hospital, and Partlow State School and Hospital.[3] These institutions provide diagnostic, therapeutic, vocational training, and other services to mentally ill and retarded persons in Alabama.[4] Several provisions of the Code of Alabama require or contemplate that patients be assigned and treated separately upon the basis of their race and color.[5]

---

1. Title 22, § 311, Code of Alabama, Recompiled 1958 (Supp.1968).

2. *Id.* §§ 312, 315.

3. *Id.* § 318.

4. *Id.* §§ 319, 320.

5. Title 45, §§ 207, 208, 209 and 248, Code of Alabama, Recompiled 1958.

Bryce and Searcy Hospitals are functionally similar institutions for the insane. Bryce, however, is principally for whites; Searcy principally for Negroes. There are approximately 4,700 white patients and 400 Negro patients at Bryce. Only Negro patients residing north of Highway 80 and diagnosed as having acute [6] impairments are admitted to Bryce, which is located in Tuscaloosa, Alabama. The main Bryce complex is available to white patients, whether their impairments are diagnosed as acute or chronic, without regard to residence. No Negroes and whites are housed in the same building: 160 Negroes live at Bryce Treatment Center Number Two, in a segregated facility which is eight miles from the main complex; the remaining Negroes live in Ward X and the Lodge, separate buildings of the main complex, and the Colony, adjacent to Bryce Treatment Center Number Two, for purposes of performing work at or around these facilities. Searcy Hospital provides for approximately 2,500 Negro and no white patients.

Partlow Hospital is designed for patients diagnosed as mentally retarded. It presently services approximately 1,850 white and 460 Negro patients. It is admitted that patients at Partlow are assigned to separate wards on the basis of race.

It is also clear from this submission that the medical services and facilities for care and rehabilitation of Negro patients are not only separate from but are typically inferior to those available to white patients. In contrast to the main complex at Bryce the physical facilities at Searcy are very old and crowded, have no day rooms, and have bare cement floors and seating consisting of backless wooden benches. Bryce has many recreational and occupational programs and craft shops; Searcy has a television set, dominoes and cards, if requested, and a weekly visit from the recreation department.

Negroes are also faced with inferior facilities within Bryce. While the segregated facility at Bryce Treatment Center Number Two is adequate physically, its location eight miles from the main complex denies to Negro patients several of the benefits available there.[7] Those who live at the Colony, adjacent to Treatment Center Number Two, face similar disadvantages plus an old and inferior building. Ward X and the Lodge are a part of the main complex at Bryce. Ward X is particularly unsatisfactory. Negroes are housed in the old, dimly lighted building solely to work in the laundry and certain kitchen areas at Bryce. The building is adjacent to the laundry, is set off from the rest of the complex, and has a living space comprised of one large room with approximately 87 beds in close quarters. The Lodge apparently is a converted stable and is located at the rear of the main complex.

Segregated and unequal services are also afforded Negro patients at the Part-

6. In psychiatric or medical parlance, the term "acute" is used to describe a sudden, self-limiting illness which runs a short course; the term "chronic" refers to a longer lasting illness which may be permanent.

7. Among these is the "open door" policy which permits certain patients to leave the hospital and which is utilized as a medical rehabilitative technique to prevent personality deterioration in the long-confined mentally ill. The result has been the restoration of many patients as functioning members of society. At the main complex the patients have access to regular bus transportation into town, enabling them to engage in such normal activities as purchasing goods; at Treatment Center Number Two there is no bus transportation to town. In addition, the treatment center suffers from a lack of any canteen available for making one's own purchases. It also lacks dental services. Further, the Negro patients at Treatment Center Number Two do not have the benefit of special psychiatric projects available to the white patients at the main complex such as the project of intensive treatment for young male schizophrenics financed by the Public Health Service.

low State School and Hospital. The general hospital at Partlow, which is used to treat mentally retarded persons who otherwise become physically ill, admits all new patients without regard to race or color until mental testing and classification is completed and before they are assigned by race within the institution. However, the facilities at that hospital are available to all white patients without regard to the seriousness of their ailments, and all such white patients are treated there. The hospital is available only to those Negro patients with major physical ailments; all Negroes with minor physical ailments are treated at a separate infirmary. Educable children eat and are housed in segregated wards.

The staffs of the institutions also sound the separate and unequal theme. There are no Negro professional staff members, such as physicians, psychologists and nurses, at the three institutions. There are 23 white staff physicians and 26 white consultants in the medical and surgical specialties for the 5,100 patients at Bryce. For the 2,500 patients at Searcy the professional staff is comprised of one white doctor and four Cuban refugee doctors unlicensed to practice medicine in Alabama. Bryce has the services of nurses in training. No nurses' training program has ever existed or been sought at Searcy. Expenditures at Searcy have been proportionately lower per patient than at Bryce,

and Searcy has never applied for any Public Health Service grants.

Subprofessional personnel are also subjected to separate and unequal treatment. Prior to October, 1966, a pay differential based on race was the explicit practice. A merit system was introduced at that time which treats all new employees equally. But because existing employees were placed in the new system on the basis of the pay they received under the old system, the discriminatory differential will not be eliminated until 1973, when all old employees will reach the top step in the scale. Certain of these personnel are also treated to segregated dining facilities.

The record also reveals considerable expert medical testimony to the effect that there is no medical justification for the segregation of patients and personnel in the Alabama mental health system. It is admitted that during the brief time in the spring of 1966 when some patients at the institutions were integrated, no problems were encountered, and no detrimental effects on patients resulted.

The State of Alabama, through its Department of Mental Health and the Alabama Mental Health Board, has received substantial federal financial assistance from several federal programs.[8] The total of all Public Health Service grants to the State for use in its mental health system is estimated to have been

8. The State has received the following federal financial assistance:

A. A grant to Bryce Hospital to develop intensive treatment for young male schizophrenics under § 303(a) (2) of the Public Health Service Act (42 U.S.C. § 242a).

B. Grants to both Bryce and Partlow State School and Hospital to support programs of inservice training for psychiatric aides and attendants under § 303(a) (1) of the Public Health Service Act (42 U.S.C. § 242a).

C. A grant to Partlow State School and Hospital to improve care for physically handicapped patients under § 303 (a) (2).

D. A grant to the Alabama Department of Mental Health to assist the State in maintaining and expanding community health services under § 314(c) of the Public Health Service Act (42 U.S.C. § 246(c)).

E. Surplus food commodities from the United States Department of Agriculture, distributed to the State under the Food Distribution Program (7 U.S.C. §§ 612 (c) and 1431), surplus property under the Federal Property and Administrative Services Act of 1949 (40 U.S.C. § 484), and financial assistance under the Elementary and Secondary Education Act of 1965 (20 U.S.C. § 241a), for use in the State's mental health facilities.

approximately $200,000 per year every year since the enactment of the Civil Rights Act of 1964. The three institutions are also estimated to receive approximately $200,000 per year in the form of surplus food commodities from the Department of Agriculture.

The regulations promulgated in implementation of Title VI by HEW and the Department of Agriculture were approved by the President on December 3, 1964, and require that every application for federal financial assistance, as a condition of its approval:

> "contain or be accompanied by an assurance that the program will be conducted or the facility operated in compliance with all requirements imposed by or pursuant to this part. * * * Any such assurance shall include provisions which give the United States a right to seek its judicial enforcement." 45 C.F.R. 80.4(a), 7 C.F.R. 15.4(a).

Since February, 1965, Alabama officials have given HEW and the Department of Agriculture at last eight written assurances that they would operate their programs receiving federal financial assistance in compliance with Title VI. Each assurance included the recognition and agreement that it was given in consideration of and for the purpose of obtaining federal financial assistance, that such assistance would be extended in reliance on the representations and agreements made in the assurance, and that the United States should have the right to seek judicial enforcement of the assurance.

It appears that State officials did not begin immediately to take steps to comply with Title VI. But with some reminders from HEW, limited desegregation was begun in 1966. However, in the spring of 1966, the Office of the Governor of the State of Alabama informed the then Director of the Alabama Department of Mental Health, Dr. J. S. Tarwater, that the Governor was opposed to steps that were being taken to desegregate the mental health institutions. The few patients who had been integrated were promptly resegregated. On June 20, 1966, Dr. Tarwater informed the Regional Health Director of the Public Health Service that the Alabama Mental Health Board had resolved to take no further steps to get into compliance.

After conducting an investigation of the three institutions, HEW instituted formal administrative compliance proceedings on January 13, 1967. A full hearing was held on April 11 and 12, 1967. The Hearing Examiner rendered his initial decision October 4, 1967, holding that the Alabama Mental Health Board and the three institutions were in violation of Title VI and the applicable regulations. He recommended that the Surgeon General and the Secretary of Agriculture terminate and refuse to grant or continue any classes of federal financial assistance for use in any activities conducted in the operation of the Alabama mental health system, said termination to remain in effect until the noncompliance is corrected and the appropriate federal officials are satisfied that full compliance will be had in the future. There has been, as yet, no final determination in that proceeding.[9]

A second administrative proceeding was begun on July 13, 1967, involving the federal assistance extended to Alabama under the Federal Property and Administrative Services Act of 1949 and the Elementary and Secondary Education Act of 1965. The administrative hearing originally scheduled for September 27, 1967, has been twice postponed and to date no hearing has been held.

During the pendency of the administrative proceedings, as Alabama was advised, action on its applications for new assistance to the three institutions has been deferred until Alabama is found to

9. It is a certified copy of the record in that administrative hearing which provides much of the factual background in this case.

be in compliance with the requirements of Title VI and the implementing regulations. Federal assistance is continuing on applications previously approved.

## II

### CIVIL ACTION NO. 2615–N

■ This Court is clear to the conclusion that the segregation and discrimination based on race practiced by Alabama officials in the mental health system violate the rights of plaintiff Marable and his class under the Equal Protection Clause of the Fourteenth Amendment. As this Court recently stated in holding racial segregation of the Alabama prison system unconstitutional:

> "Since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the numerous cases implementing that decision, it is unmistakably clear that racial discrimination by governmental authorities in the use of public facilities cannot be tolerated." Washington v. Lee, D.C., 263 F.Supp. 327, 331, aff'd *per curiam*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212.

See also Johnson v. Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195; Singleton v. Board of Commissioners, 356 F.2d 771 (5th Cir. 1966). And we fully agree with the statement of Judge Sobeloff who, in referring to the desegregation of prisons in Washington v. Lee, supra, argued:

> "*A fortiori*, the Constitution will not tolerate racial segregation of patients in a publicly-supported and regulated hospital." Cypress v. Newport News General and Nonsectarian Hospital Ass'n, 375 F.2d 648, 656, n. 15 (4th Cir. 1967).

■ The Alabama Mental Health Board does not seriously dispute this general conclusion. Its principal defense concerning this private action contests plaintiffs' standing to challenge segregation at Partlow State School and Hospital because none of them are patients at that particular institution. It is no more necessary for plaintiffs to be confined in every facility administered by the Mental Health Board than it was for plaintiff-inmates in Washington v. Lee, supra, who were held to be a proper class to challenge practices at all Alabama correctional institutions, to be incarcerated at every such institution. As the Supreme Court recently made clear in Flast v. Cohen, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 20 L.Ed.2d 947, the function of the "standing" doctrine is to insure that suits are brought by a person (or a class) who is a proper party to request an adjudication of a particular issue. Particularly in these civil rights cases, when a plaintiff with an interest genuinely adverse to the state agency sued is before the court, standing doctrine will not be used to delay still longer the operation of constitutional commands, to foster unnecessary litigation, or to undermine the effectiveness of the class action device in this area.

■ The Mental Health Board also challenges plaintiffs' standing to raise the issue of discrimination in employment practices, including the pay rates of subprofessional personnel. We agree that plaintiffs do not have standing to challenge the practices as potential employees, but we must conclude that they do have standing because of the secondary effects on plaintiffs as patients of the discrimination against staff personnel. Plaintiffs stand in the same relationship to the hospital staff as students in the public schools stand to their teachers. In the latter connection, this Court has stated:

> "It is no longer open to question that faculty and staff desegregation is an integral part of any public school desegregation plan—not because of teachers' employment rights, but because students are entitled to a non-racial education, and assignment of teachers to students on the basis of race denies students that right." Lee v. Macon County Board of Education, 267 F.Supp. 458, 472 (M.D.Ala.1967), aff'd *sub nom.* Wallace v. United

States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422.

See also United States v. Jefferson County Board of Education, 372 F.2d 836, 883–886 (5th Cir. 1966), cert. denied *sub nom.* Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

We are aware that a three-judge court in the Northern District of Georgia has recently held that Negro prisoners do not constitute a proper class for challenging alleged discrimination in the employment of Negroes at penal institutions and as deputy sheriffs within the State of Georgia. Wilson v. Kelley, N.D. Ga., June 27, 1968, 294 F.Supp. 1005, aff'd *per curiam*, 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425. Whatever binding effect a summary affirmance would ordinarily have on this three-judge court, we do not feel bound by the per curiam affirmance in Wilson v. Kelley, supra. The three-judge court held not only that plaintiffs were not a proper class but also that the named defendants were not representative of the class from which relief was sought. The court concluded: "Thus, for the lack of a proper class on either side, the second claim [discrimination in employment] must be dismissed." *Id.,* at 1011. If the court was correct in either holding, it would have been in order for the Supreme Court to summarily affirm. In the case now before us, instituted by private parties, we hold that plaintiffs have standing and that the discrimination in employment practices is unconstitutional.

### III

#### CIVIL ACTION NO. 2610–N

Because we have concluded in No. 2615–N that segregation and discrimination in the operation of Alabama's mental health system clearly violate the Equal Protection Clause, we find it unnecessary to resolve the technical questions involving Title VI of the Civil Rights Act of 1964 which arise in this action. The order entered herein will provide full relief for both Alabama and the United States. It will put Alabama in compliance with the requirements of Title VI, thus meeting the demands of the United States and permitting Alabama to become eligible again for federal assistance in the full range of its mental health program. See Lee v. Macon County Board of Education, 270 F. Supp. 859 (M.D.Ala.1967).

### IV

#### RELIEF

The relief in these cases will be modeled substantially after the decree in Washington v. Lee, supra. Like the operation of penal institutions, the operation of a mental health system is a highly specialized professional endeavor; and in devising ways and means of desegregation this Court would defer to the sober judgment of experienced personnel to the greatest extent possible. We thus find it unnecessary to issue a formal injunction at this time. Moreover, we feel it desirable to give the responsible officials ample time to accomplish desegregation in a manner that works a minimum of disruption on the ongoing programs of the institutions. Twelve months should be ample for the desegregation of Bryce and Searcy. Three months should be ample for Partlow, since only intra-institution transfers are involved.

As a final caveat, we would make explicit here what was only implicit in Washington v. Lee, supra, viz., that this decree should not be construed as precluding responsible officials from making, in good faith and in particularized circumstances, medical discriminations which take racial factors, such as patients' fears and delusions, into account. Racial classifications are always suspect, however, and if such actions are challenged, the burden will be on the officials to demonstrate that the discrimination is medically justified.

A formal order will be issued in accordance with the foregoing.