Stephanie OTERO et al., Plaintiffs,

v.

**MESA COUNTY VALLEY SCHOOL DISTRICT NO. 51 et al., Defendants.**

No. 74–W–279.

United States District Court, D. Colorado.

Dec. 30, 1975.

Vilma S. Martinez and Sanford J. Rosen, Mexican-American Legal Defense Fund, San Francisco, Cal., Paul A. Baca and Federico F. Pena, Mexican-American Legal Defense Fund, Arthur S. Lucero, Colorado Rural Legal Services, Denver, Colo., Jose D. L. Marquez, Colorado Rural Legal Services, Grand Junction, Colo., for plaintiffs.

Nelson, Hoskin, Groves & Prinster by John W. Groves and Jon E. Getz, Grand Junction, Colo., for defendants.

## MEMORANDUM OPINION

WINNER, District Judge.

On October 4, 1974, this case was certified as a Rule 23(b)(2) class action with the following stipulated class definition:

> "All persons attending or entitled to attend Mesa County Valley School District No. 51 having a Spanish surname, and all other persons attending or entitled to attend such schools who consider themselves or are considered by the school or the community to be of Mexican-American origin or ancestry, who are being denied an equal educational opportunity because of their race or national origin in that the District's curriculum, personnel, and other programs provide an inadequate or unequal educational service which does not take into account their linguistic or cultural differences."

As will be seen presently, this class definition stems directly from the so-called "Cardenas Plan" which is discussed in *Keyes v. School District No. 1* (1975), 10 Cir., 521 F.2d 465, and it was obviously phrased by plaintiffs' counsel in anticipation of the testimony of Dr. Cardenas in the trial of this case. Plaintiffs here make no claim of segregation, and, as plaintiffs' position is summarized in counsel's opening statement, plaintiffs say that "the cultural and linguistic makeup of Chicano students has posed an educational incompatibility between District 51's educational program and the learning style of these students to the degree that they do not effectively and equally benefit from the school's

program as compared to Anglo students." Later in his opening statement counsel said, "Plaintiffs' case will unveil the principal cause for Chicano students' poor performance in school, namely, that District 51 has created a school system oriented for middle class, Anglo Children, has staffed that system with non-Chicano personnel who do not understand and cannot relate with Chicano students who are linguistically and culturally different, to the extent that Chicano students and their parents do not feel that School District 51 is 'their' school." Plaintiffs say that these accusations, if proven, would violate their constitutional rights and would violate rights given them under certain federal statutes. Plaintiffs seek injunctive relief requiring the school district to provide a type of bilingual/bicultural education acceptable to plaintiffs and their counsel, and, collateral to that relief, plaintiffs want injunctive relief conforming the district's employment practices to plaintiffs' views. Plaintiffs want to restructure the curriculum of Mesa Valley School District No. 51, and they want to tailor it to accommodate plaintiffs' concept of the alleged needs of an astonishingly small number of students. What plaintiffs really want is to substitute their judgment for the thoughtful, independent judgment of the elected school board which, for the most part, has acted only after obtaining recommendations of qualified, duly appointed school officials and recommendations of qualified independent experts hired by the school board.

At the outset, the parties should be identified, or, in the case of the defendants, at least grouped, and, since the trial was largely a battle of experts, the principal experts should be identified, because time and space just do not permit a summary of all of the expert testimony. Plaintiffs are all students of or former students who dropped out of District 51 schools.[1] All bring the action through their parents as next friends. Stephanie Otero was a kindergarten student; Brenda Otero was in the first grade; Wilford Trujillo was in the fifth grade; Sara Jane Trujillo was in the sixth grade; Rebecca Trujillo dropped out of the tenth grade; Jeanette Romero dropped out of the eleventh grade and John Martinez was in the ninth grade. The defendants are an assorted group. The school district is named; the school board members are named; the superintendent is a defendant; the personnel director is being sued; the director of federal programs is another defendant, and the remaining defendants are school principals.

Coming now to an identification of the chief expert witnesses, plaintiffs called the most experts, but defendants called the experts who to me gave the more logical, believable testimony. Certainly, if the expert testimony proved anything, it proved that educational theory is not an exact science, and an expert can be found who will testify to almost anything. Listening to these experts causes one to conclude that if psychiatrists' disagreements are to be compared to differences between educators, psychiatrists are almost of a single mind. Beyond peradventure, in considering the need for and the type of bilingual/bicultural education, no school board could ever devise any plan which would not be subject to vehement attack by experts employed by persons who didn't like the school board's plan. With equal certainty, any plan mandated by a court would rest on the same shaky foundation. Be that as it may, among others, the following independent experts testified:

*For plaintiffs:*

Dr. Mary Ann Shoening. An expert in statistics with a specialty in analyzing or comparing test results.

---

1. Pages of testimony are devoted to the drop out rate. Some District 51 figures are in error because transfers are inadvertently shown as drop outs. I devote no time to a discussion of drop outs, because I find no causal connection between drop outs and alleged language deficiency.

Ernesto Andrade. An expert in curriculum with a specialty in bilingual/bicultural education and in staffing bilingual/bicultural programs.

Dr. George Andrew Keating. An expert in reading with a subspecialty in relating reading development to minority students and particularly to Mexican-American students.

Dr. Jose Cardenas. An expert in curriculum, bilingual/bicultural education and all sorts of other things.

Dr. Rolf Kjolseth. An expert in sociolinguistics, linguistics, language development and language assessment.

*For defendants:*

Dr. Gene Glass. An expert in educational research with subspecialties in statistics, measurements in education and psychology, research in experimental design in education, education evaluation and educational psychology.

Dr. Edgar Ray Garrett. An expert in language with subspecialties in bilingual education as related to language, language arts, speech and test evaluation and testing as related to special education and language.

Dr. Guadalupe Fallis. An expert in sociolinguistics with particular attention to the use of Spanish in the Southwest and bilingualism in the Southwest.

Their testimony as to educational theory was applied to these facts. Geographically, School District No. 51 is one of the largest school districts in the state. It covers 65% of Mesa County and it includes an area of 2,150 square miles in which 95% of Mesa County's school population resides. Of the total enrollment of the District, 89.8% of the pupils are Anglos, 2% of the pupils are either Black, Oriental or Native American, and 8.2% of the students are Mexican-American. The Mexican-American population is spread throughout the District, although there is some concentration of Mexican-Americans in the southwestern part of Grand Junction and in

Fruita. The distribution of minority students in the District's schools is:

| | |
|---|---|
| High School. | The distribution ranges from 6.4% to 9.4% among the three high schools. |
| Junior High. | The distribution ranges from 6.4% to 11/8% in the six junior high schools. |
| Elementary. | The distribution ranges from 1.1% to 30.1% among the 19 elementary schools. Of the 19 elementary schools, only two have minority concentrations of more than 16%. |

On a socio-economic basis, Mexican-American students rank very low. Almost four times as many Mexican-Americans as Anglos are enrolled in the free lunch program, and the same comparison applies to the number of Mexican-American families having incomes below the federal poverty level. ⟨Undeniably and unfortunately, the socio-economic level of the Mexican-American students makes the obtaining of an education more difficult, but, although the record establishes this, the record does not establish that language barriers are holding back any significant number of Mexican-Americans, and, in fact, the record is quite weak in proving that the problems of a single Mexican-American in District 51 are fairly attributable to language deficiency⟩ Although the experts battled at length over the quality of the school board's tests, [and I shall devote a few words to this battle later] 628 students were tested. Of the tested students, eight (.0127%) were found to be Spanish dominant, five (.0080%) were found to be essentially bilingual, and four (.0064%) were found to be Spanish proficient. Dr. Garrett concluded (and I accept his conclusions despite the attacks made by plaintiffs on Dr. Garrett's conclusions and testing procedures) that only an extremely small number of Mexican-American students have any problem in speaking or comprehending English; that less than three percent of all elementary Mexican-American students have any proficiency in speaking or comprehending Spanish, and "My opinion is that the presence of Spanish is not interfering with the English scores. *The list of 54 that we identified as being quite low in*

*all cases had English scores that were higher than their Spanish scores."* Thus, accepting the validity of the tests, as I do, there is no deficiency on the part of a significant number of Mexican-American students in English language proficiency, and the students who are deficient in English are also deficient in Spanish. When we come to academic achievement, the experts differ even more sharply as to the causes, and it is shown that Mexican-American students do not all achieve as well as their Anglo counterparts. Even the plaintiffs' experts disagree among themselves as to the reasons, and they surely disagree with defendants' witnesses. Dr. Cardenas testified to the same theory discussed by the Tenth Circuit in *Keyes*:

"I'm of the opinion that in general minority children including Mexican-American are the recipients of instructional programs that were designed for a different type of children . . . And to a great extent minority children do not fit in these categories— tend to perform at a lower level due to the incompatability between the instructional program in the school and the characteristics of the minority pupil."

Dr. Glass put the blame on the socio-economic level of the Chicano students, and for the most part I agree and so find. He said that language problems were not the cause for the slight differences in achievement, and he pointed out that nationally, Chicanos score about three-fourths of a standard deviation below the national norm, while in Grand Junction, the majority of Chicanos in the six elementary grades score at or above the national norm. The problem then, is less severe in Grand Junction than it is nationally. I am unconvinced that any achievement problems encountered by Mexican-American students in District 51 are attributable to language deficiencies or language problems. Not only do I think that defendants' experts are the more persuasive, but the testimony of plaintiffs' own witnesses make plaintiffs' position unacceptable and untenable to

me. In the first place, no named plaintiff demonstrated a proficiency in Spanish superior to that same student's proficiency in English. Children raised in the same home have no consistency in their academic achievement, yet they were all exposed to the same language and cultural environment in the home. For example, Becky Trujillo isn't doing very well in school, but one of her brothers did very well. Plaintiffs' whole case grounds on the argument that when Spanish is spoken in the home, the child won't do well in school if the instruction is in English. It seems to me that this position is difficult to defend under the testimony of Dr. Rolf Kjolseth, one of plaintiffs' experts. He has two children who attend public schools taught in English. Although Dr. Kjolseth's native tongue is English, he and his wife make a conscious effort to speak only Spanish in the home. He testified:

"Q. Doctor, how many languages do you speak?

"A. Four. English, which is my mother tongue, Spanish, French and German. I might add, if I may, that I never learned one in school . . .

"Q. *What language do you speak at home?*

"A. *Spanish exclusively* . . .

"Q. Are your children monolingual in Spanish?

"A. No, no, both children are completely bilingual. *It's exclusively Spanish which is spoken at home, but in almost all of the other areas of social life it's English that is spoken* so they are completely bilingual."

Dr. Kjolseth's children are doing quite well in school, but if the arguments of Dr. Cardenas be accepted, they shouldn't be. Dr. Kjolseth is voluntarily putting his children in the environment about which plaintiffs complain, but the Kjolseth children do well.

Painting with a broad brush, plaintiffs say that the results shown by District 51's tests and conclusions of their ex-

perts should be disregarded because the tests and their administration were improper and inadequate, all as is shown by a "home survey" conducted for plaintiffs. It is beyond my ability to determine which of the many available tests is the best test. District 51 used the STACL test and the Dos Amigos test, among others. When persons holding doctorates in education can't agree, it would be no more absurd for me to prescribe medical treatment than it would be for me to rank educators' tests. Neither is a function of a court. Testing procedures are to be determined by good faith decisions made by local school boards in accordance with the good faith recommendations of school officials and good faith recommendations of any independently employed experts. That's exactly what District 51 did, and as far as I am concerned, any suggestion that the board members of District 51 or the officials of District 51 acted in any way other than in total good faith is unfair and is unsupported by the record. I would not substitute my judgment for the better informed good faith judgment of the school board and its experts, but it just so happens that I thought the testimony of the school board experts as to testing procedures and the conclusions reached as a result thereof made good sense—much better sense than did the opposing testimony critical of the testing procedures and conclusions.

The objections of plaintiffs and their experts to the testing procedures adopted by the school board rest almost entirely on a "home survey" conducted for plaintiffs. That survey was conducted by Jose Cruz, an employee of the Colorado Civil Rights Commission acting under the direction of plaintiffs' lawyers to "ascertain if there was Spanish spoken in the homes of Spanish surnamed students." The survey was strictly a do-it-yourself poll, and it was supported by neither scientific design, training nor planning, nor was it taken by trained pollsters. In the Tenth Circuit, scientifically structured surveys and polls are admissible at least for some purposes. This is established by Judge Breitenstein's opinion in *Standard Oil Company v. Standard Oil Company* (1958), 10 Cir., 252 F.2d 65, a trademark infringement suit. There, a scientifically designed poll was conducted to determine if there was confusion in the public mind. It was held:

"The results of a public recognition survey may properly be received to establish whether trade symbols in question have achieved a degree of public recognition that constitutes secondary meaning and as to whether there is confusing similarity in designations.

"The admissibility of the survey evidence is attacked on the ground of hearsay. The persons who conducted the surveys were called as witnesses. Of the persons interviewed, forty-five testified at the trial or by way of deposition. The hearsay objection is not well taken. The persons who did the interviewing testified as to the results of their surveys. Their testimony was offered solely to show what they found. Only the credibility of the persons who took the statements was involved and they were before the court. The technical adequacy of the surveys was a matter of the weight to be attached to them. Elaborate evidence was received from the defense on this point."

The foundational evidence supporting the home-made "home survey" fell far, far short of the foundation laid in *Standard Oil*. Nevertheless, I received the results of the "home survey" into evidence. Plaintiffs attempt the long jump from this unscientific survey which asked if Spanish was spoken in the home to try to land on a conclusion that the students themselves speak Spanish as a dominant language, and that they are being deprived of a meaningful education because they are taught in English. Plaintiffs can't jump that far. The survey could have asked the primary language of the children resident in the home and it could have asked if the children living in the home spoke Spanish. No such questions were asked, yet the

tests given by the school board showed that almost all of the Spanish surnamed children comprehended English better than they did Spanish, and that most of them didn't understand simple Spanish words and phrases. Mr. Cruz acknowledged, "This is the only time that I have conducted a survey whereby it's been used as any kind of evidence," and he was unable to say whether any of the pollsters had any experience in conducting surveys. He had no background at all in polling, and it is apparent that this survey was prepared by and was conducted for counsel for plaintiffs to bolster their lawsuit.[2] I received the "home survey" in evidence, but I am unable to attribute any substantial weight to it, although plaintiffs' experts had to give great weight to this poll to arrive at their conclusions. The reliance placed on the survey by plaintiffs' witnesses weakens their testimony, just as plaintiffs' case is weakened by their unbending refusal to give any credence to the tests and testing procedures adopted by the school board acting in reliance on recommendations made by its qualified experts. Plaintiffs either do not or will not understand that the STACL and Dos Amigos tests were given to determine language proficiency in Spanish or deficiency in English. That inquiry is much more important to a determination of a student's ability to learn in English than is a "home survey" designed to find out if any Spanish is spoken in the home without inquiry as to who speaks the Spanish and to what extent Spanish is spoken. The school board didn't just lunge into utilizing the STACL and Dos Amigos tests, and their selection of and reliance on these tests and testing procedures cannot be said to be unsupported. The record shows:

1. Dr. Garrett, a testing expert, fully investigated the tests and testing procedures.

2. The tests were shown to be used throughout the Southwest.

3. The State Department of Education tacitly approved the tests.

4. Dr. Fallis and Dr. DuBois, sociolingual experts, examined the tests for content validity and possible lexical and phonetic differences between Grand Junction and the area of the Southwest where the tests were normed.

5. After careful review of the STACL and the Dos Amigos tests the experts recommended changes, and the changes were made.

6. The testing teams received adequate training.

7. The examination of the tests by Dr. Glass established their psychometric properties as being sufficient to assess English-Spanish proficiency.

If the tests established nothing else, they established that very, very few of the children tested understood Spanish, and, even if the tests and testing procedures could be said to be open to minor technical criticisms, it is impossible to say that the school board did not in complete good faith spend tax dollars to try to administer a fair test designed to find out how many if any, children weren't receiving an adequate education because of language deficiency. If, as has been said so often, a defendant in a criminal case is entitled to a fair trial but not a perfect trial, I think that it must follow that a student is entitled to a fair testing procedure even if it be not perfect. The tests and testing procedures District 51 used were fair, and I think they got the job done.

Probably almost everything I have said thus far is unnecessary to a decision of this case. During pretrial hearings and at time of trial I commented that I anticipated that I would be the first judge required to face up to the equal protection question because the Supreme Court said in *Lau v. Nichols* (1974), 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1, "We

2. The nature of the participation of Cruz, Dr. Jackson and other government employees in this lawsuit was such that one cannot help but

question the alleged impartiality of certain state and federal bureaucracies.

do not reach the Equal Protection Clause argument which has been advanced but rely solely on § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d." Nor did the Tenth Circuit reach the Equal Protection argument in *Serna v. Portales Municipal Schools* (1974), 499 F.2d 1147. However, I did not anticipate *Keyes v. School District No. 1*, (1975), 10 Cir., 521 F.2d 465, and the Equal Protection question is now authoritatively decided in the Tenth Circuit in exactly the same way I said at trial I thought that it should be decided. Chief Judge Lewis said:

> "The clear implication of arguments in support of the court's adoption of the Cardenas Plan is that minority students are entitled under the fourteenth amendment to an educational experience tailored to their unique cultural and developmental needs. Although enlightened educational theory may well demand as much, the Constitution does not. In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 35–37, 93 S.Ct. 1278, 36 L.Ed.2d 16, the Supreme Court held that education is not a right protected by the Constitution except, perhaps, insofar as some minimal quantum of education may be necessary to enable the exercise of the basic rights of speech and voting. Of course, where the state has undertaken to provide an education to its citizens, it must be made available to all on equal terms. *Brown I*, supra, 347 U.S. at 483, 74 S.Ct. 686. But the plaintiffs and intervenor in the present case argue for a right to differential treatment of minority children in the educational process. As the Court stated in Rodriguez:
>
>> " '[E]very reform that benefits some more than others may be criticized for what it fails to accomplish. But we think it plain that, in substance, the thrust of the [state's educational] system is affirmative and reformatory, and therefore, should be scrutinized under judicial principles sensitive to the nature of the State's efforts . . . . 411 U.S. at 39, 93 S.Ct. at 1300.'

"Thus we refuse to affirm the court's adoption of the Cardenas Plan on the second ground urged by the parties, that is, that the school's alleged failure to adapt to the cultural and economic needs of minority students amounts to a violation of the fourteenth amendment.

"Neither *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1, nor this court's holding in *Serna v. Portales Municipal Schools*, 10 Cir., 499 F.2d 1147, is contrary to our position. Both of these cases stopped short of reaching any constitutional issue. In both, school authorities were held, rather, to have violated section 601 of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, in failing to provide language instruction to substantial numbers of non-English-speaking children enrolled in public schools."

In *Keyes*, there was a finding of segregation. Here there is no claim of segregation. In *Keyes* the trial judge found a deprivation of a meaningful education of Mexican-American children. I make no such finding here, and the record would support no such finding. The Tenth Circuit opinion does not mention the inevitable prospective outcome, but as I have said on occasion in the course of hearings in this case, if there were an Equal Protection right to bilingual/bicultural education, the needs of a single student would give rise to that right, and our nation's schools would bankrupt themselves in meeting Equal Protection claims to bilingual educations in every conceivable language and dialect.

Plaintiffs' counsel have over-reacted to the Tenth Circuit opinion in *Keyes*, and some of the comments made by them surely were made in haste. However, a sampling of those comments is in order as indicative of counsels' unwilling recognition of the fact that *Keyes* destroys plaintiffs' bilingual/bicultural case. These illustrative pithy remarks I extract from plaintiffs' brief:

" . . . despite the misapprehensions of the Tenth Circuit, this court,

therefore, should not follow the rationale of the Tenth Circuit in *Keyes*."

"Thus, the Tenth Circuit in *Keyes* is clearly in error by suggesting that bilingual-bicultural programs are remedies of which courts lack specialized knowledge and experience."

"Plaintiffs contend that the Tenth Circuit's 14th Amendment ruling is insufficient and erroneous and should not be followed by this Court."

Unfortunately for plaintiffs, I agree with the opinion of Chief Judge Lewis in *Keyes*, but even if I didn't, I do not consciously defy the Court of Appeals and I do not consciously refuse to follow its opinions, nor do I think counsel should urge such a course of conduct on me. However, I guess counsel's displeasure is understandable after all of the effort which has gone into this case, and it cannot be denied that there has been a lot of input, although much of it has been backing and filling. There are 3,003 pages of depositions, 257 pages of pleadings not counting the 654 pages of interrogatories and answers thereto, 1,058 pages of briefs, 360 pages of miscellaneous material, more than 3,000 pages of reporters' transcript and 492 exhibits which total more than 10,000 pages. The case was fully presented and argued.

█ It is settled, then, that under Tenth Circuit law there is no constitutional right to bilingual/bicultural education, and our appellate court has held that even where there is segregation [and there is none in District 51] a trial court cannot impose the Cardenas Plan on a school district. Not that I would have imposed the plan on the District had the *Keyes* decision not come down. At least as applied to District 51, on the record made in this case, I found the Cardenas Plan to be illogical, unbelievable and unacceptable, and the only part of Dr. Cardenas' testimony I wholeheart-

edly agreed with was his response to a question I asked him at the end of his stint on the witness stand. I asked him, in effect, that if we assume a good faith though imperfect effort on the part of a school board to provide any needed bilingual/bicultural education, is a school district and are the students better off under school board supervision or under the supervision of a poorly informed federal judge. Dr. Cardenas quite candidly said that the school district and the students are better off with the program being operated under the good faith efforts of the school board and its employees. I agree, and I find that District 51, the members of the board of District 51, the school officials, the principals, and, in fact, all of the defendants in this case were at all times acting in complete good faith in attempting to ascertain the amount of bilingual/bicultural education which was needed by the students of District 51 and in providing the amount of that education which they believed was needed. I am sure they did a better job than I could do.[3]

█ From what has been said, I think it apparent that in addition to the determination that there is no constitutional right to bilingual/bicultural education, there is no failure on the part of District 51 to comply with any federal statute or regulation. *Lau v. Nichols* (1973), 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1, is of no help to plaintiffs. There were 2800 Chinese school children who did not speak, understand, read or write English involved in *Lau*. As to 1800 of those children the school district took no steps to deal with the language deficiency. This was held to be in violation of an HEW regulation which required:

"Where inability to speak and understand the English language excludes national origin-minority group children from effective participation in the educational program offered by a school

3. The recent proliferation of lawsuits against school districts, schools and school officials suggests that some people think that the courts should assume overall supervision of the nation's educational system, but I disagree, although I confess that I wonder if school personnel should not be awarded combat pay for their efforts in trying to educate in today's climate.

district, the district must take affirmative steps to rectify the language deficiency in order to open its instructional program to these students."

Justice Blackmun added:

"Against the possibility that the Court's judgment may be interpreted too broadly, I stress the fact that the children with whom we are concerned here number about 1,800. This is a very substantial group that is being deprived of any meaningful schooling because the children cannot understand the language of the classroom. We may only guess as to why they have had no exposure to English in their pre-school years. Earlier generations of American ethnic groups have overcome the language barrier by earnest parental endeavor or by the hard fact of being pushed out of the family or community nest and into the realities of broader experience.

"I merely wish to make plain that when, in another case, we are concerned with a very few youngsters, or with just a single child who speaks only German or Polish or Spanish or any language other than English, I would not regard today's decision, or the separate concurrence, as conclusive upon the issue whether the statute and the guidelines require the funded school district to provide special instruction. For me, numbers are at the heart of this case and my concurrence is to be understood accordingly."

The Tenth Circuit made a similar ruling in *Serna v. Portales Municipal Schools* (1974), 499 F.2d 1147, where, in affirming a trial court decision which found that large numbers of students were unable to learn in English and which outlined a plan after it was shown that the district's plan was only a token, Judge Hill said:

"The New Mexico State Board of Education stresses the effect the decision will have on the structure of public education in New Mexico. It is suggested that bilingual programs will now be necessitated throughout the state wherever a student is found who does not have adequate facility in the English language. We do not share SBE's fears. As Mr. Justice Blackmun pointed out in his concurring opinion in Lau, numbers are at the heart of this case and only when a substantial group is being deprived of a meaning education will a Title VI violation exist."

*Lau* and *Serna* both had to do with large numbers of students who had language deficiencies and who could not learn in English. Our case involves a very few, if any, students who have real language deficiency. *Lau* and *Serna* dealt with school boards which were making no real effort to meet the problem. We deal with a school board which is making a real, conscientious effort to recognize, face and solve any problem which may exist as to any student. Judge Mechem tried to get the school officials to initiate a meaningful program, and he stepped in only after he became convinced that only a token effort was being made by the school officials. District 51 has made and it is making a real effort, an all out effort, which in no circumstances can be said to be a mere token effort. I could do no better, and I do not believe that a federal judge should step in where the school board and the school officials are doing their best and are doing a good job. The only injunctive order I could in good faith enter would be one which ordered the school board to "keep up the good work." As Chief Judge Lewis said in *Keyes*:

"Direct local control over decisions vitally affecting the education of children 'has long been thought essential both to the maintenance of community concern and support for public schools and to the quality of the educational process.' *Milliken v. Bradley*, 418 U.S. 717, 741, 742, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069; *Wright v. Council of the City of Emporia*, 407 U.S. at 451, 469, 92 S.Ct. 2196, 33 L.Ed.2d 51. Local control permits citizen participation in the formulation of school policy

and encourages innovation to meet particular local needs. Educational policy, moreover, is an area in which the courts' 'lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at state and local levels.' *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16. The policy of the State of Colorado is to encourage local school districts to develop bilingual skills and to assist in the transition of non-English-speaking students to English. The state legislature has established a comprehensive program for the education of children of migrant workers and has mandated the teaching of minority group history and culture in all public schools. Denver school authorities maintain a variety of programs for assistance of children who have learning difficulties because they come from non-English-speaking families. We believe that the district court's adoption of the Cardenas Plan would unjustifiably interfere with such stand and local attempts to deal with the myriad economic, social, and philosophical problems connected with the education of minority students."

■ Everything said by Chief Judge Lewis about the necessity for retaining local control of school systems where there are no constitutional infractions or infractions of federal statutes or regulations by school districts is emphatically applicable to this case. Colorado statutes and programs are as applicable to Mesa Valley School District 51 as they are to the Denver School District. District 51 takes full advantage of all available federal and state funds, and it also maintains a variety of programs to assist children who have learning difficulties, including children, if any, who have learning difficulties because of language deficiency. There exists no constitutional right to bilingual/bicultural education, and there has been no showing that inability to speak and understand the English language excludes more than a tiny handful [if that many] of national origin minority group children from effective participation in the educational program offered by District 51. However, there has been a showing that District 51 has taken and is taking affirmative steps to rectify any possible language deficiency to assure that its instructional program will be available to all students. Plaintiffs have no case for a claimed constitutional violation because they do not assert segregation and there is no constitutional right to bilingual/bicultural education. Plaintiffs have proven no case under the *Lau-Serna* doctrine.

Left for relatively brief discussion, then, is plaintiffs' claim of employment discrimination. I am confronted at the outset with the question of plaintiffs' standing to challenge District 51's employment practices in employing teachers and in employing janitors and bus drivers. Volumes have been written on the standing question. I could, but I shall not discuss a handful of Supreme Court cases such as *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; *Data Processing v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192; *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636; *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254, and a host of others.

The most recent Tenth Circuit case on standing with which I am familiar is *Chicano Police Officers Association v. Stover* (1975), 526 F.2d 431. It was there held [footnotes omitted]:

"First, plaintiffs argue that the trial court erred in holding that no plaintiff has standing to challenge the hiring policies of the Department. As stated, the court reasoned that the injury alleged by the Association and one officer is that the development of power to negotiate for the betterment of the position of Chicanos is stifled by policies perpetuating under-representation of Chicanos. However, the court concluded that the Association and its members have only an indirect stake

in the outcome and are not entitled to assert the right of those directly affected and not otherwise present in the suit—persons unsuccessfully seeking employment or discouraged from doing so.

"We must, of course, observe the requirements for standing which have a constitutional starting point in Article III. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343; *Data Processing Service v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184. The plaintiffs must show that the challenged action has caused them injury in fact, economic or otherwise, and that the interest they seek to protect is arguably within the zone of interests to be protected or regulated by the statute and the constitutional guarantee in question. Id. at 152–53, 90 S.Ct. 827; *United States v. SCRAP,* 412 U.S. 669, 686–90, 93 S.Ct. 2405, 37 L.Ed.2d 254. They must have a personal stake in the outcome. *Warth v. Seldin,* supra, 422 U.S. at 499, 95 S.Ct. 2197. This requirement is to insure that concrete adverseness which sharpens presentation of issues on which the courts depend for illumination of difficult constitutional questions. *O'Shea v. Littleton,* 414 U.S. 488, 493–94, 94 S.Ct. 669, 38 L.Ed.2d 674; *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663.

"Nevertheless, the standing requirement is not to be applied to defeat constitutional claims. An 'identifiable trifle' is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation. *United States v. SCRAP,* 412 U.S. 669, 689, n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254.

"In our case we have both individual plaintiff Chicano officers and the Association. This is not, however, a class action maintained for others. The plaintiffs allege that by denying to them and other Chicano citizens the benefits of being hired and promoted—which denial is on the basis of invalid tests and criteria having no substantial relationship to job performance—the effect is to exclude a disproportionate number of Chicano citizens in violation of the equal protection clause and various statutes. The affidavit of Mr. Chavez supports the general claims made, stating that in working with the Department for fair treatment of Chicanos and other minorities, the Association must have the support of as many Chicanos as possible; that only if it represents a substantial number of policemen can they negotiate effectively with the Department from a position of strength; that discrimination against Chicanos in recruitment and hiring dilutes the strength of the Association and directly affects its effectiveness; and that Chavez is personally affected in his attempts to change the system by the effect of what he believes to be discrimination against Chicanos in the entrance procedures of the Department.

"We are satisfied that both the Association and the individual plaintiffs made a sufficient showing of standing. This was demonstrated, we feel, by undisputed proof and reasonable and obvious inferences. The Association had 44 signed members at the time of trial (Nov. 26, 1973), and about 50 members in all (Tr. 82). Of these only one or two were Anglos. Ibid. In the period from April to June, 1973, the court's findings state that there was approximately 70 Spanish-speaking/surnamed officers and approximately 312 Anglos officers on the force (see Finding 23). Thus, from the proof it is clear that a substantial portion of Chicanos obtaining employment on the force joined the Association. The Association therefore has a direct stake, independent of its members' rights under the Civil Rights Act, in challenging barriers against employment of those from whom it might well enhance its membership and resources to attain its goals. *Warth v. Seldin,* supra, 422 U.S. 511, 95 S.Ct. 2197, 45 L.Ed.2d 343; *Albany Welfare Rights Organization v. Wyman,* 493 F.2d 1319, 1322 (2d Cir.).

"We are also satisfied that the proof made a sufficient showing of standing of the individual plaintiffs to challenge the hiring procedures. There is recognition of secondary effects on others as a valid basis for standing in several instances. In *Marable v. Alabama Mental Health Board,* 297 F.Supp. 291, 297–98 (M.D.Ala.), the court upheld the standing of individual mental patients for themselves and for a class to challenge the discriminatory hiring practices affecting staff personnel of the institution where they were located. The court reasoned that the secondary effects of discrimination on the plaintiffs as patients entitled them to challenge the hiring procedures relating to the staff personnel. Ibid. In like manner the standing of students to challenge the discriminatory policies of teacher assignments has been sustained on the rationale that the removal of a discriminatory educational system and the achievement of a non-racially operated system afforded standing rights to individual plaintiffs. *Lee v. Macon County Board of Education,* 267 F.Supp. 458, 472–73, 478 (M.D.Ala.), aff'd *sub nom. Wallace v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422.

"Moreover, this court recently affirmed a similar order for transfer of school officials, recognizing implicitly the standing of individual students to assert the invalidity of discriminatory personnel policies affecting others because the policies had a secondary effect on the students. See *Dowell v. Board of Education of the Oklahoma City Public Schools, Unpublished Order* (10th Cir., January 31, 1975), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 [44 U.S.L.W. 3201, (10/7/75)]. The fact that harm from discriminatory hiring policies is imposed directly on the rejected or discouraged applicant does not deprive the present Chicano officers of standing to challenge the hiring practices that are asserted to produce an underrepresentation of Chicanos on the force. The indirectness of the injury to the employees does not necessarily deprive them of standing to vindicate their rights, see *Warth v. Seldin,* supra, 422 U.S. 504–05, 95 S.Ct. 2197, and to seek removal of the taint of racial discrimination from the work force.

"In sum, we are satisfied that both the Association and the individuals made a sufficient showing of standing to challenge the allegedly discriminatory hiring policies and, of course, there is no indication of a lack of concrete adverseness between the position the plaintiffs take and that of defendants. See *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663. It follows that we must hold that the court was in error in its findings and conclusions denying standing to plaintiffs to challenge the entry level hiring procedures."

*Stover* is deserving of these comments:—

It is talking about constitutional claims, but plaintiffs assert no deprivation of any constitutional claim because they do not argue segregation and because they confine their argument to bilingual/bicultural education to which they have no constitutional right. As is noted in *Stover, Warth v. Seldin* (1975), 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 is the last expression by the Supreme Court on standing, and there plaintiffs did not fare well in trying to upset zoning laws of the community of Penfield. Ortiz, Reyes, Sinkler and Broadnax were low income minority members who did not live in Penfield. They did not have standing to attack the zoning ordinance, even though they pleaded that they wanted to live in the community. The Supreme Court said:

"We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the courts' intervention."

Another group of plaintiffs was composed of taxpayers in Rochester who said

that Penfield's zoning caused them economic injury. They had no standing because:

"But even if we assume that the taxpayer-petitioners could establish that Penfield's zoning practices harm them, their complaint nevertheless was properly dismissed. Petitioners do not, even if they could, assert any personal right under the Constitution or any statute to be free of action by a neighboring municipality that may have some incidental adverse effect on Rochester. On the contrary, the only basis of the taxpayer-petitioners' claim is that Penfield's zoning ordinance and practices violate the constitutional and statutory rights of third parties. namely persons of low and moderate income who are said to be excluded from Penfield. In short the claim of these petitioners falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves."

The last group of plaintiffs was a group of associations, and this portion of the Supreme Court's decision in *Warth* explains *Stover,* and, to me, holds that plaintiffs in this case have no standing to argue District 51's employment practices.

One association, Metro-Act had a membership made up in part by Penfield residents, and another association was a group of home builders who operated in Penfield. Neither was afforded standing. The Court recognized:

"There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members . . . .. Even in the absence of injury to itself, an association may have standing solely as the

representative of its members. E. g., *National Motor Freight Traffic Assn. v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy. See *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . .

"Even if we assume arguendo that apart from any statutorily created right the asserted harm to Metro-Act's Penfield members is sufficiently direct and personal to satisfy the case or controversy requirement of Art. III, prudential considerations strongly counsel against according them or Metro-Act standing to prosecute this action. . . . *This is an attempt to raise putative rights of third parties, and none of the exceptions that allow such claims is present here.* In these circumstances, we conclude that it is inappropriate to allow Metro-Act to invoke the judicial process."

The Home Builders Association lost on the standing question, and the Court concluded:

"The rules of standing, whether as aspects of the Art. III case or controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."

█ I think that careful analysis of *Stover* and *Warth* lead to the inescapable conclusion that plaintiffs have no standing to challenge District 51's hiring practices where they have no constitu-

tional right to bilingual/bicultural education and where they failed miserably in their efforts to bring themselves within the *Lau-Serna* decisions. Nor do I think that *Dowell v. Board of Education* or *Lee v. Macon County Board of Education,* mentioned by Judge Holloway in *Stover,* are to the contrary. In both of those cases there was proven segregation—proven violation of constitutional rights—and plaintiffs had a personal stake in protecting those rights. The Otero plaintiffs do not say that there has been any segregation, and they are not the victims of violation of any of their constitutional rights. Plaintiffs here have failed to show any actionable wrong against them, and reading *Stover* in the light most favorable to a broad grant of standing, I think that to hold that these plaintiffs have any standing to challenge District 51's hiring practices on the record made in this case would be to fly in the teeth of *Warth v. Seldin.* I hold that plaintiffs do not have standing to challenge the hiring practices of District 51.

■ I do not quit my discussion of District 51 employment practices with a decision that plaintiffs are without standing to challenge them. I do not want to try this case over again if I can possibly avoid it, and, accordingly, I assume arguendo that plaintiffs do have the requisite standing. With that assumption, I recognize that statistics are important and must be considered when employment discrimination is charged. *Jones v. Lee Way Motor Freight, Inc.,* 10 Cir., 431 F.2d 245; *Spurlock v. United Airlines, Inc.,* 10 Cir., 475 F.2d 216. Statistically, District 51 doesn't look good. Although defendants think it inapplicable, I approach this phase of the case by applying the principles of *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, *McDonnell-Douglas* was explained in *Sabol v. Snyder,* (1975), 10 Cir., 524 F.2d 1009:

> "McDonnell requires that to establish a prima facie case of discrimination, the plaintiff show (1) that she is a member of a racial minority; (2) that

she applied and qualified for a position for which the employer was seeking applicants; (3) that she was rejected in spite of her qualifications; and (4) that the position remained open and the employer continued to seek applicants."

Accepting for the purpose of this discussion that plaintiffs have standing and that statistical data constitutes a prima facie showing of discrimination, and saying arguendo that plaintiffs laid the *Sabol* groundwork (which they didn't) defendants completely rebutted any suggestion of discrimination on the part of District 51. Every reasonable effort has been made to hire qualified Mexican-American teachers, but there just aren't . very many of them available, and with the nation-wide push on bilingual education, those teachers are blessed with a seller's market. District 51 has recruited throughout the southwest, and no qualified Mexican-American teacher who wanted to teach in District 51 has been turned down. As to the more menial jobs, I can't fault District 51 for turning down bus drivers who have bad driving records, and secretaries who can't type. Proof of failure to employ qualified minority applicants for other jobs is equally weak.

Moreover, even if I were to accept an argument that the statistical case made in support of a claim of discrimination in non-academic jobs is sufficient to establish past discrimination [and I make no such finding] nevertheless, District 51 has adopted an affirmative action program to increase the employment of Mexican-Americans, and it is doing a good job in this area. This case seeks no back pay. All plaintiffs ask is injunctive relief. There is no reason to order an injunction where there is no damage claim, where defendants are already doing everything I could possibly order them to do, and where there is every reason to assume that they will continue that good job. "Ordinarily, also, the court may order that the action for injunction be dismissed where the questions involved have become moot, as

where the conduct sought to be enjoined has been discontinued; however, where the plaintiff seeks damages, as well as an injunction, and an injunction cannot be granted because of a change in circumstances, the court should not dismiss the action, but should retain it for the assessment of damages." 42 *Am.Jur.2d Injunctions,* § 291, p. 1089. Such was the holding of *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303.[4]

Giving plaintiffs the benefit of every possible doubt, I find no justification for granting them any relief in this case. That being so, in accordance with Rule 58, the clerk shall forthwith prepare, sign and enter a judgment in favor of defendants denying all relief to plaintiffs. Defendants are awarded their costs.

4. The District's affirmative action program is in part post lawsuit, but I do not think that the program is lawsuit induced. It is a natural outgrowth of defendants' efforts to perform their duties effectively, lawfully and well.